**IN RE GRAND JURY SUBPOENAS DATED JANUARY 20, 1998.**

No. 98 CV 1243(RR).

United States District Court,
E.D. New York.

Feb. 27, 1998.

Laura A. Brevetti, New York City, for Patrolmen's Benevolent Association.

Zachary W. Carter, U.S. Atty., Eastern District of New York, Brooklyn by Lauren J. Resnick, Andrew Weissmann, Asst. U.S. Attys., for United States.

*AMENDED Memorandum and ORDER*

RAGGI, District Judge.

The Patrolmen's Benevolent Association of the City of New York (PBA), which represents 26,000 New York City police officers and 19,000 retired officers, moves to limit the testimony of three union officials who received subpoenas dated January 20, 1998 to appear before a grand jury that is investigating possible criminal conduct by a number of New York City police officers. The incident that is the focus of the federal inquiry has already led to the filing of both federal and state criminal charges against a number of police officers. Because the federal grand jury investigation is ongoing, this court does not detail the incident in this decision.

The three subpoenaed officials all hold positions within the PBA that provide for them "to represent and act" on behalf of members "in all matters pertaining to the performance of their duties as Patrolmen." *See* Constitution and By-laws of the Patrolmen's Benevolent Association, Art. IX, §§ 6, 7 & 8 (attached as Exh. 1 to PBA Memorandum of Law). In some circumstances, this representation may involve only informal discussions with Police Department management. In others, union officials will represent police officers in more formal internal proceedings. In this case, it appears that shortly after one or more of the subpoenaed witnesses conversed with certain police officers, the PBA arranged for private attorneys to represent the officers in defending against the state criminal charges.

The PBA submits that *any* conversations between the subpoenaed witnesses and any police officers regarding the events under criminal investigation are privileged. Specifically, the union asserts that the attorney-client privilege shields these communications, although none of the subpoenaed witnesses are in fact members of the bar. Four officers have appeared before the court through counsel specifically to invoke this privilege. It also appears that the PBA and the officers may be urging recognition of some other privilege generally shielding communications between union members and their representatives on matters of union concern.

Having carefully considered the submissions of the parties and having heard oral argument, the court finds that no privilege affords the broad shield urged by the PBA. Its motion to preclude all questioning of the subpoenaed witnesses regarding their conversations with police officers about the matter under federal investigation is denied.

### Discussion

I. *Standards Applicable to Claims of Privilege*

 Rule 501 of the Federal Rules of Evidence states that privileges "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience." Fed.R.Evid. 501; *see Trammel v. United States,* 445 U.S. 40, 47, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). This language does not "freeze the law of privilege." *Id.* Rather, it " 'provide[s] the courts with the flexibility to develop rules of privilege on a case-by-case basis.' " *Id.* (citing 120 Cong. Rec. 40891 (1974)).

 In deciding whether a particular case presents facts warranting the recognition or application of a privilege, certain general principles apply. Foremost among these is the "fundamental maxim," recognized "[f]or more than three centuries, ... that the public ... has the right to every man's evidence." *United States v. Bryan,* 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950); *accord United States v. Nixon,* 418 U.S. 683, 708–10, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Jaffee v. Redmond,* 518 U.S. 1, 116 S.Ct. 1923, 1928, 135 L.Ed.2d 337 (1996). Thus, courts start " 'with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.' " *United States v. Bryan,* 339 U.S. at 323 (quoting 8 J. Wigmore, *Evidence* § 2192 (3d ed.1940)). It is the party seeking an exception from this principle that bears the burden of establishing the existence of a privilege and its applicability to a particular case. *See, e.g., United States v. International Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997). The burden is a heavy one since privileges are neither "lightly created nor expansively construed." *United States v. Nixon,* 418 U.S. at 710. Instead, they are recognized " 'only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.' " *Trammel v. United States,* 445 U.S. at 50 (quoting *Elkins v. United States,* 364 U.S. 206, 234, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (Frankfurter, J., dissenting)); *accord Jaffee v. Redmond,* 116 S.Ct. at 1929 (for a privilege to be recognized it must not only promote confidential communications valued by the parties; it must serve an important public interest).

In this case, the PBA has failed to demonstrate that any privilege shields its officials from answering any and all grand jury questions about conversations they may have had with police officer members regarding the events now under federal investigation.

II. *Union Official–Union Member Privilege*

 The PBA cites no case in which a federal or state court has ruled that some form of union privilege bars a prosecutor or grand jury from inquiring into conversations between a union member and his union representative. For this court to so hold would require it to recognize a new privilege. As noted, courts proceed with extreme caution before recognizing new privileges. Four criteria are generally relevant: (1) the communication at issue must be made in confidence, (2) confidentiality must be essential to the maintenance of a full and satisfactory relationship between the parties, (3) the parties' relationship must be one that the community has decided ought to be sedulously fostered, and (4) the injury that would inure to the relationship by the disclosure of the communication must plainly outweigh the important societal interest in obtaining all the evidence necessary to ensure the correct disposal of litigation. *See* 8 J. Wigmore, *Evidence* § 2285 (McNaughton Rev.1961).

 Applying these principles to this case, the court declines to recognize a common law privilege shielding conversations between union officials and members on matters of union concern. Preliminarily, the court notes that the affidavits submitted by the parties are not sufficiently detailed to establish that *all* of the communications that are the subject of this *in limine* motion were made in confidence. For example, the court does not know how many conversations the subpoenaed witnesses had with officers regarding the matter under federal investigation. Nei-

ther does it know where each meeting took place, the participants therein, the subjects discussed, or the procedures employed by the PBA to ensure confidentiality. Similarly, the subjective assertions of the union officials and the officers that total confidentiality was essential to the maintenance of their relationship are not enough to establish this element conclusively. *See generally Walker v. Huie,* 142 F.R.D. 497, 500 (D.Utah 1992) ("one could perhaps envision a satisfactory union representation relationship without total confidentiality").

Nevertheless, even if the court were to assume that a fuller exploration of these first two factors would support the movant's claim, the PBA has still failed to show that the union relationship is so highly valued by an ordered society that its confidences warrant protection even at the cost of losing evidence important to the administration of justice. This same conclusion was reached by the district court in *Walker v. Huie, supra.* In that case, a Salt Lake City police officer was sued for violations of plaintiffs' constitutional rights in connection with an arrest. Plaintiffs sought to depose the police association president who had represented the officer in his departmental disciplinary proceedings. Defendant and the union president moved for a protective order claiming that their conversations were privileged. The court found that whatever injury disclosure might cause to the relationship between police officers and their union representatives, that injury did not outweigh the benefit to be gained from the correct disposal of the litigation. *See id.* at 501. This court finds the reasoning of *Walker* persuasive and its conclusion even more applicable when considered in the context of a criminal proceeding.

Certainly, the PBA cannot claim that the confidential relationship between a union representative and a union member has the same strong historic roots as those generally afforded the protection of a common law privilege, *i.e.,* husband and wife, clergyman

and communicant, or attorney and client. Neither does the union relationship appear more deserving of protection than other important confidential relationships which courts have refused to recognize as privileged. *See, e.g., University of Pennsylvania v. EEOC,* 493 U.S. 182, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) (refusing to recognize a privilege for confidential communications in course of university peer review proceedings); *United States v. Gillock,* 445 U.S. 360, 373, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980) (rejecting speech and immunity privilege for state legislators); *Couch v. United States,* 409 U.S. 322, 335, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973) (no accountant-client privilege exists under federal law); *In re Grand Jury,* 103 F.3d 1140, 1147 (3d Cir.1997) (in rejecting parent-child privilege, the court reviews similar holdings by other federal circuit and district courts and the overwhelming majority of state courts); *see also United States v. Nixon,* 418 U.S. at 712–13 (refusing to recognize a general privilege shielding all communications between the President of the United States and his senior advisors).

The court further notes that the union relationship was not among those specifically enumerated for the protection of a privilege in Article V of the Federal Rules of Evidence proposed by the Supreme Court to Congress in 1973.[1] Although Article V was never adopted, the omission of a privilege from its proposed list "does suggest that the claimed privilege was not thought to be ... indelibly ensconced in our common law ...." *United States v. Gillock,* 445 U.S. at 367–68 (applying this logic to rejection of a speech and debate privilege for state legislators). *Cf. Jaffee v. Redmond,* 116 S.Ct. at 1930 (in recognizing psychotherapist-patient privilege, Supreme Court notes inclusion of such a privilege in proposed federal rules).

Moreover, as the United States points out in its opposition papers, considerable efforts have been made to codify some form of union

---

**1.** The nine privileges listed were (1) attorney-client privilege, (2) psychotherapist-patient privilege, (3) physician-patient privilege, (4) husband-wife privilege, (5) clergy-communicant privilege, (6) ballot privilege, (7) trade secret privilege, (8) state secret privilege, and (9) informant privilege. *See* Proposed Federal Rules of Evidence 501–

513, H.R. Doc. No. 93–46 at 9–19 (1973). If Article V had been adopted, federal courts would have been limited to these privileges except for those specifically mandated by the Constitution or laws of the United States. *See United States v. Gillock,* 445 U.S. at 367.

privilege in New York. To date, they have proved unsuccessful. In vetoing a 1996 version of the legislation, the Governor explained:

This bill would ... create a new testimonial privilege. Specifically, the bill provides that when a police officer has requested the assistance of counsel and makes a communication to a police union official concerning matters other than wages, hours, working conditions, collective bargaining agreements and retirement benefits, the police union official cannot be required to disclose the communication in any action or proceeding against the police officer. Under the bill, accordingly, a union delegate could not be compelled to testify in court about a communication by a police officer evidencing criminal conduct committed by the officer in the course of his or her official duties. That is a steep price to pay for the goal of encouraging police officers to obtain guidance from union officials, and I have not been presented with sufficient facts justifying this new testimonial privilege.

See Exh. C to Government's Memorandum of Law. The inability of New York's executive and legislative branches to reach agreement on the costs and benefits of a union privilege strongly cautions against this court finding that such a privilege should now be enshrined in common law. While a "consistent body of policy determinations by state legislatures" may be an appropriate reflection of "reason" and "experience," *Jaffee v. Redmond,* 116 S.Ct. at 1929–30 (all fifty states and the District of Columbia had enacted some form of psychotherapist privilege before the Supreme Court recognized the privilege pursuant to Fed.R.Evid. 501), the New York debate suggests that there is no clear consensus in favor of a general union privilege.[2]

The only support for movant's claim that some privilege should shield the confidential communications of union officials and union members is found in those cases that have

held it to be an unfair labor practice for an employer to seek to question a union representative about statements made by an employee who the representative was assisting in an internal disciplinary proceeding. *See City of Newburgh v. Newman,* 70 A.D.2d 362, 365–66, 421 N.Y.S.2d 673, 675–76 (3d Dep't 1979); *Seelig v. Shepard,* 152 Misc.2d 699, 702, 578 N.Y.S.2d 965, 967 (Sup.Ct. 1991).[3] The "privilege" recognized in these cases has not, however, been held to apply against any party other than the employer. Indeed, in *City of Newburgh,* a case involving a police officer's communications with a union representative for the purpose of obtaining advice and assistance in connection with a disciplinary matter, the Third Department noted that "[a]ny privilege" shielding these conversations operated "only as against the public employer." 70 A.D.2d at 366, 421 N.Y.S.2d at 676.

The Court of Appeals for the District of Columbia drew the distinction even more emphatically in *United States Dep't of Justice v. Federal Labor Relations Auth.,* 39 F.3d 361 (D.C.Cir.1994). In that case, the Department of Justice Office of Inspector General opened an investigation into possible corruption by a border patrol agent of the Immigration and Naturalization Service. That employee consulted with a union representative, providing details about his conduct. The Inspector General's office thereafter questioned the union representative, rejecting his claim that his conversations with the employee were privileged. Subsequently, the Federal Labor Relations Authority held that the actions of the Inspector General constituted an unfair labor practice. The Court of Appeals vacated this decision. It ruled that any union privilege shielding the conversations of a union member and his representative applied only as against management, and was "not good as against the world." *Id.* at 369. The court held that the Office of the Inspector General was not an arm of management; rather, it operated "in-

---

**2.** The parties have not cited the court to any legislation in other states relating to a general union privilege.

**3.** Although not cited by movant, *United States Dep't of Treasury Customs Serv., Washington,*

*D.C.,* 38 F.L.R.A. 1300, 1308 (1991) also holds that a federal employer cannot seek to learn from a union official the statements of an employee made in the course of union representation.

dependently" and its "investigatory procedures are not a proper subject of collective bargaining." *Id.* In this case, both the federal grand jury that has subpoenaed the PBA witnesses and the federal prosecutor who seeks to question them before that body are even more independent from management than was the Inspector General's Office in *Department of Justice.* Neither the collective bargaining process nor the state laws that protect that process can limit the scope of a federal criminal investigation. Indeed, in *Department of Justice*, the parties apparently conceded that a union privilege "would not shield a conversation between an employee and his union representative from disclosure ... before a grand jury." *Id.*

Having reviewed what appears to be the pertinent legal authority, this court finds that movant has not demonstrated that society's interest in encouraging confidential communications between union members and their representatives is so strong as to outweigh its interest in having all relevant evidence of criminal conduct explored. The court finds no union privilege to bar the examination of the subpoenaed witnesses before the grand jury.

### III. *Attorney–Client Privilege*

■ The attorney-client privilege is generally understood to apply where legal advice of any kind is sought "from a professional legal advisor in his capacity as such." *United States v. International Bhd. of Teamsters,* 119 F.3d at 214. It is undisputed that the subpoenaed union officials are not licensed attorneys and that no police officer who consulted them reasonably believed them to be authorized to practice law. Thus, whatever representation, advice, or guidance police officers may have sought from these union officials, their communications do not fall within the strict parameters of the attorney-client privilege. *See Walker v. Huie,* 142 F.R.D. at 501 (rule that evidentiary privileges be "strictly construed" precludes distortion of common law definition of "lawyer" to include a union official representing police officer at disciplinary proceeding); *see also* Proposed Rule of Evidence 503(a)(2) ("lawyer" defined as "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation");

*Moorhead v. Lane,* 125 F.R.D. 680 (C.D.Ill. 1989) (attorney-client privilege did not extend to inmate communications to "jailhouse lawyer").

The PBA and the police officers nevertheless urge this court to extend the attorney-client privilege to the facts of this case. They submit that any conversations the officers may have had with the subpoenaed witnesses were part of the process necessary to have the PBA provide members with counsel to defend them in possible criminal proceedings.

■ The purpose of the attorney-client privilege is to "promot[e] full and frank conversations between attorneys and their clients," thereby encouraging "observance of the law" and aiding "in the administration of justice." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). Because the privilege "stands in derogation of the public's 'right to every man's evidence, ... it ought to be strictly confined within the narrowest limits consistent with the logic of its principle.'" *In re Horowitz,* 482 F.2d 72, 81 (2d Cir.), *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973) (quoting 8 J. Wigmore, *Evidence* §§ 2192, 2291 at 70, 554 (1961)); *accord United States v. International Bhd. of Teamsters,* 119 F.3d at 214. In applying these principles to the PBA's request for an expansion of the attorney-client privilege, the court notes that the affidavits submitted by the subpoenaed witnesses do not specify what particular role each of them played in securing counsel for the four officers who are before the court. Neither do they indicate how the conversations between the witnesses and the police officers promoted full and frank conversations between those officers and their lawyers.

It is, of course, undisputed that all four officers are presently represented in state criminal proceedings by lawyers retained by the PBA. Apparently, a member's right to PBA-retained counsel derives not from the union's Constitution or By-laws but from its collective bargaining agreement with the City of New York. Although the parties have not provided the court with a copy of this agreement, counsel for the subpoenaed union

officials represented at oral argument that the City provides the PBA with funds that the union then uses when it is necessary to retain counsel for police officers, as is the case when officers face possible criminal charges arising out of their job performance. There appears to be no discretion in the PBA to deny counsel to an officer who is the subject of a criminal investigation and, for that reason, no policy requiring union officials to make any particular findings before honoring a request for counsel. In short, an officer might wish to consult with a union official because he values the opinions and advice of that representative, but nothing before the court indicates that the officer is obliged to discuss his conduct with a union representative as a prerequisite to securing PBA-retained counsel. The court therefore rejects the PBA's argument that the process for securing PBA appointed counsel requires extension of the attorney-client privilege to a union official's conversations with a police officer.

In *In re Grand Jury Subpoena Duces Tecum,* 112 F.3d 910, 921 (8th Cir.1997), the Eighth Circuit declined to extend the attorney-client privilege to White House officials who spoke with government attorneys about matters under criminal investigation. The court explained that "[a]n official who fears he or she may have violated the criminal law and wishes to speak with an attorney in confidence should speak with a private attorney, not a government attorney." *Id.* So in this case, an officer who wishes to ensure that anything he says relating to a criminal matter is shielded by the attorney-client privilege should wait to discuss the particulars with the counsel retained for him by the PBA and not rely on some general assumption that any communications he has with a union representative are somehow shielded from grand jury inquiry.

■ In further support of their argument that the police officers' conversations with non-lawyer union representatives should be covered by the attorney-client privilege, the PBA relies on Judge Friendly's decision in *United States v. Kovel,* 296 F.2d 918 (2d Cir.1961). In that case, an attorney retained an accountant to assist him in the legal representation of a client. The court recognized that a trained accountant might sometimes have to participate in conversations with a client if an attorney was to understand and address a client's legal needs.

> Accounting concepts are a foreign language to some lawyers in almost all cases, and to almost all lawyers in some cases. Hence the presence of an accountant, whether hired by the lawyer or by the client, while the client is relating a complicated tax story to the lawyer, ought not to destroy the privilege, any more than would that of [a foreign language interpreter]; the presence of the accountant is necessary, or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit.

*Id.* at 922. *Kovel* is, however, factually distinguishable from this case in a number of important respects. First, the relationship between the client and a licensed attorney was already established before the challenged conversations with the accountant took place. Second, the conversations with the accountant were at the lawyer's express request. Finally, the sole purpose of the conversations with the accountant was to assist the attorney in his representation of the client. In this case, many if not all of the conversations between the subpoenaed union representatives and the police officers who now assert an attorney-client privilege took place before those officers ever entered into any confidential relationship with a licensed attorney. There is no evidence that any attorney requested the PBA officials to question the police officers. In sum, the court finds that movant has failed to demonstrate that the conversations were had to assist an attorney in the representation of a client. Instead, it appears that the conversations were to assist the union representative in understanding the member's problem so that *the representative* could then advise the member as to his rights and options, including his right to private counsel retained by the union. This court is simply not prepared to extend the attorney client privilege to those conversations a person may have with a third party—whether a union representative, a parent, a trusted teacher, or a close friend—in seeking that party's guidance

about a potential legal problem or assistance in procuring a lawyer.[4]

The union submits that its obligation to provide an attorney for its members makes it akin to an insurer. It cites cases in which an insured's conversations with an insurer have been held to be privileged. *See Linde Thomson Langworthy Kohn & Van Dyke. P.C. v. Resolution Trust Corp.*, 5 F.3d 1508 (D.C.Cir.1993); *Kandel v. Tocher*, 22 A.D.2d 513, 256 N.Y.S.2d 898 (1st Dep't 1965). Not insignificantly, neither of these cases recognizes a privilege in the context of a criminal investigation. In fact, as the Court of Appeals noted in the *Linde Thomson* case, "[f]ederal courts have never recognized an insured-insurer privilege as such" in any context. *Id.* at 1514. The particular claim of an insured-insurer privilege was rejected in *Linde Thomson*. Only in *dicta* did the court state that "where the insured communicates with the insurer for the express purpose of seeking legal advice with respect to a concrete claim, or for the purpose of aiding an insurer-provided attorney in preparing a specific legal case, the law would exalt form over substance if it were to deny application of the attorney-client privilege." *Id.* at 1515. It is not clear that the case before this court even falls within this *dicta*. The conversations between the subpoenaed witnesses and various police officers have not been detailed in the affidavits submitted to the court and so the court cannot say whether the officers were seeking "legal advice with respect to a concrete claim" or only general advice about their rights and obligations. Further, the affidavits submitted to this court do not establish that the conversations were undertaken with the express purpose of assisting "[a union]-provided attorney in preparing a specific legal case."

In any event, the relationship between insured and insurer is not sufficiently analogous to that of union member and represen-tative to support the claim of privilege in this case. As Judge Breitel explained in *Kandel,* liability insurance is unique in that "it is litigation insurance." *Kandel v. Tocher,* 22 A.D.2d at 515, 256 N.Y.S.2d at 900. It is "an institutionalized substitute for the individualized attorney-client relationship in litigation or contemplated litigation." *Id.* at 517–18, 256 N.Y.S.2d at 902. The practical consequence is that the insured and insurer often merge into a single party in any court proceeding. This is because it is the insurer who may well be obliged to pay any damages that are awarded. Membership in a union cannot be described as "an institutionalized substitute" for the attorney-client relationship. The majority of the services the PBA provides for its members are unrelated to criminal litigation. Most importantly, the union can never stand in the shoes of one of its members when that officer faces criminal charges. Unlike an insurance company, which may have to pay damages if its insured's liability is established, the PBA will not be liable at law if one of its members is convicted on criminal charges.

Finally, the PBA suggests that conversations about potential criminal matters between union officials and members are covered by the attorney-client privilege because the official is, in fact, acting as the representative of the client or the attorney in that discourse. It notes that Proposed Rule of Evidence 503(b) stated that the attorney-client privilege would shield "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or . . . (4) between representatives of the client or between the client and a representative of the client . . . ." This court understands the "lawyer's representative" provision of the proposed rule to

---

4. *Grand Jury Proceedings Under Seal v. United States,* 947 F.2d 1188 (4th Cir.1991), relied upon by movant, is not to the contrary. In that case, a grand jury target invoked the attorney-client privilege to quash a subpoena issued to his accountant. That accountant had, in the course of his work for the target, suggested that he hire an attorney. Thereafter, the target revealed to the accountant certain matters pertaining to the target's business. Subsequently, the accountant ac-companied the target to a meeting with an attorney who the target was considering retaining. En route, they discussed the matters that would be raised with the attorney. The court ruled that the conversations between accountant and client during their trip to see the lawyer would be covered by the attorney-client privilege, but it declined to extend the privilege to any of their earlier conversations. *Id.* at 1191.

formalize the holding in *Kovel.* For reasons already stated, this court rejects the argument that a union official acts as the representative of a criminal defense lawyer when no lawyer has even been contacted. The court also declines to expand the attorney-client privilege to include as client "representatives" any third-party whose assistance a person seeks in helping him obtain a lawyer.

Proposed Rule 503(b) did not define a client representative.[5] Most litigation concerning client representatives arises in the context of legal entities other than individuals, most particularly, corporations, who cannot act except through representatives. The courts' particular concern is with identifying those representatives who can fairly be equated with the "client" for purposes of the privilege. *See In re Bieter Co.,* 16 F.3d 929, 935 (8th Cir.1994) (in holding that a private consultant to a partnership was a client representative entitled to the protections of the attorney-client privilege, the court noted that a test it had previously adopted to determine who within a corporation was covered by the attorney-client privilege was "no less instructive as applied to a partnership, or some other client entity (*as opposed to an individual*), and its employees" (emphasis added)); *see generally Eutectic Corp. v. Metco, Inc.,* 61 F.R.D. 35 (E.D.N.Y.1973) ("where the dominant purpose of the communication is to facilitate the rendition of legal services to the client, and the communication itself or the substance thereof is transmitted to the lawyer shortly thereafter, the fact that the communication, at its inception, is within the corporate structure rather than directly with the attorney does not automatically defeat the privilege"). A private person, however, generally has no need for a representative to communicate with an attorney. Only in extraordinary cases, as, for example, where a client needs an interpreter, or where he is so seriously injured that he cannot deal directly with counsel, *see Hendrick v. Avis Rent A*

*Car Sys., Inc.,* 944 F.Supp. 187, 189 (W.D.N.Y.1996), has the attorney-client privilege been extended to the designated representative of an individual client. That is not this case. Each police officer was competent to discuss his concerns fully and frankly with licensed counsel without the assistance of a third party. Indeed, the affidavits of the subpoenaed witnesses do not indicate that they did anything to facilitate the communication between attorney and client.[6] Under such circumstances, the attorney-client privilege does not extend to shield an officer's communications with union representatives.

### *Conclusion*

The PBA has failed to demonstrate that conversations between the subpoenaed union officials and various police officers about an incident for which the union retained private criminal defense lawyers for the officers are in any way privileged. The motion to preclude grand jury inquiry into these conversations is denied.

*SO ORDERED.*

---

**5.** By contrast, the rule defined the "representative of a lawyer" as "one employed to assist the lawyer in the rendition of professional legal services."

**6.** In oral argument, one of the officer's defense attorneys noted that PBA officials had particular knowledge about precinct procedures that could be useful to his representation of his client. The

point is irrelevant to the attorney-client issue before this court. The fact that defense counsel may some day wish to speak to one of the subpoenaed witnesses about these procedures does not mean that he could not communicate with his client without the assistance of the witness. To the contrary, defense counsel conceded at oral argument that they independently interviewed their clients after being retained.