Merrimack
No. 2006-640

IN RE GRAND JURY SUBPOENA
(Issued July 10, 2006)

Argued: April 5, 2007
Opinion Issued: June 13, 2007

*Cook & Molan, P.A.*, of Concord (*Glenn R. Milner* and *John S. Krupski* on the brief, and *Mr. Milner* orally), for the petitioner.

*Kelly A. Ayotte*, attorney general (*Brian R. Graf*, senior assistant attorney general, on the brief and orally), for the State.

DALIANIS, J. The petitioner, a member of and steward for the Service Employees International Union, appeals the denial by the Superior Court (*McHugh*, J.) of his motion to quash the State's subpoena requiring him to testify before a grand jury. We affirm.

The trial court's order recites the following facts: The petitioner is employed as a State Correctional Officer. On or about September 15, 2005, a psychiatric social worker employed by the New Hampshire Department of Corrections (DOC) sought union representation with respect to allegations that he had carried contraband into the prison. The petitioner investigated the allegations in his capacity as the social worker's union representative, interviewing the social worker and several other individuals.

The State subpoenaed the petitioner to testify before the grand jury as to what the social worker and others told him during his investigation. The petitioner moved to quash the subpoena on the ground that his communications with the social worker and others were protected by a privilege between a union representative and a grievant. The trial court declined to recognize such a privilege and denied the petitioner's motion to quash. The trial court did not address the petitioner's alternative argument that the subpoena violated the Contract Clauses of the New

Hampshire and Federal Constitutions. *See* N.H. CONST. pt. I, art. 23; U.S. CONST. art. I, § 10. This appeal followed.

Before addressing the merits of the petitioner's appeal, we begin with new assertions he made at oral argument. At oral argument, for the first time, the petitioner argued that the subpoena violated the social worker's rights under *Garrity v. New Jersey*, 385 U.S. 493, 500 (1967). In *Garrity*, "the United States Supreme Court held that statements given under threat of discharge from public employment are compelled and may not be used in subsequent criminal proceedings." *State v. Litvin*, 147 N.H. 606, 608 (2002); *see Garrity*, 385 U.S. at 500. The record shows that, on September 16, 2005, the social worker was advised, consistent with *Garrity*, that: he had a right not to be compelled to incriminate himself; if he refused to answer the DOC's questions, he would be dismissed; and if he answered, none of his statements or any information or evidence gained because of them could be used against him in any criminal proceeding. The petitioner contended that compelling him to testify before the grand jury violated this warning. The petitioner did not brief this argument, although a footnote in his brief alluded to it.

Assuming, without deciding, that the petitioner has standing to raise an argument based upon the social worker's *Garrity* rights, we decline to address it because: (1) he did not brief it, *see State v. Scovill*, 144 N.H. 409, 414 (1999); (2) he did not raise it before the trial court and, thus, did not preserve it for our review, *see Miller v. Blackden*, 154 N.H. 448, 457 (2006); and (3) it was the subject of a trial court order that is not part of this appeal. This issue was raised before the trial court by the social worker in his motion to intervene, not by the petitioner. The social worker's attempt to raise the issue did not preserve it for our review as he was not a party to this proceeding, and thus any arguments he attempted to make were not before the trial court. *Id.*

We also do not address the petitioner's contention, made for the first time at oral argument, that we should expand the attorney-client privilege to include communications between union stewards and union employees. *See Walker v. Huie*, 142 F.R.D. 497, 501-02 (D. Utah 1992) (refusing to find attorney-client privilege applicable to conversations between police officer and his union representative). The petitioner has not briefed this contention. In his brief, he argues only that we should create a new evidentiary privilege, not that we should expand an existing one. Accordingly, we limit our analysis to the arguments the petitioner has actually briefed. *See Scovill*, 144 N.H. at 414.

The petitioner first argues that the trial court's ruling violates the privilege for confidential communications between a union representative and union employee as recognized by the New Hampshire Public

Employee Labor Relations Board (PELRB) under RSA chapter 273-A (1999 & Supp. 2006). *See New Hampshire Troopers Association v. New Hampshire Department of Safety, Division of State Police*, PELRB Decision No. 94-74 (August 31, 1994). While he concedes that the PELRB has not recognized this privilege outside of the context of an unfair labor practice charge, he asserts that the PELRB's rulings in this area "serve as sufficient grounds to overrule the trial court."

The PELRB has ruled only that an employer engages in an unfair labor practice when it compels a union representative to disclose confidential communications with a union employee. In *New Hampshire Troopers Association*, a police trooper contacted his union representative and told him of an incident in which he had been involved and that he believed would lead to discipline. *Id.* at 2. The trooper asked his union representative for assistance in contacting the union attorney and president. *Id.* Thereafter, the union representative's superior questioned him about what the trooper had told him; the union representative answered the questions asked of him. *Id.* The purpose of the questioning was to aid the employer in the anticipated disciplinary procedure involving the trooper. *Id.* at 3.

The PELRB ruled that the employer committed an unfair labor practice by questioning the union representative about what the trooper told him. *Id.* at 5. As the PELRB explained, "In pursuing its disciplinary investigation, the Division of State Police has all of the options it might exercise under its managerial prerogative. This does not extend to allowing the employer to interfere with the Union in its role as representative of the individual member accused of misconduct." *Id.*

The PELRB's ruling in *New Hampshire Troopers Association* comports with rulings by the National Labor Relations Board (NLRB) and Federal Labor Relations Agency (FLRA). *See Cook Paint and Varnish Company*, 258 N.L.R.B. 1230 (1981); *U.S. Department of Treasury*, 38 F.L.R.A. 1300 (1991). In *Cook Paint and Varnish Company*, the NLRB ruled that the employer engaged in an unfair labor practice when it threatened a union representative with discipline for refusing to submit to interrogation about conversations with a union employee. *Cook Paint and Varnish Company*, 258 N.L.R.B. at 1231-32. The union representative had been involved in the employee's grievance of his discharge. *Id.* at 1231. Shortly before the grievance was to be arbitrated, the employer asked the union representative for information about the incident for which the employee had been terminated and for his notes of his conversations with the employee about that incident. *Id.* The NLRB ruled that this constituted an unfair labor practice. *Id.* at 1231-32. The NLRB cautioned, however, that its ruling was limited—not all discussions between

employees and their stewards are confidential and protected by the Federal National Labor Relations Act. *Id.* at 1232.

The FLRA reached a similar conclusion in *U.S. Department of Treasury*, 38 F.L.R.A. at 1308-09. In that case, the employer required the union representative to disclose, under threat of disciplinary action, statements that the employee had made to the representative while the representative was representing him in a disciplinary proceeding. *U.S. Department of Treasury*, 38 F.L.R.A. at 1302. The FLRA concluded that the conversations between the union representative and employee constituted protected union activity and that interfering with that activity violated the Federal Service Labor-Management Relations Statute. *Id.* at 1308-09.

We disagree that the PELRB's rulings in the context of unfair labor practice charges provide a basis for recognizing the existence of a privilege in the context of a grand jury proceeding. As another court has noted with respect to the privilege recognized by its state public employment relations board, the kind of privilege established by the PELRB "is strictly limited to communications between a union member and an officer of the union, and operates only as against the public employer, on a matter where the member has a right to be represented by a union representative, and then only where the observations and communications are made in the performance of a union duty." *City of Newburgh v. Newman*, 421 N.Y.S.2d 673, 676 (App. Div. 1979). Such a privilege "may be good as against management[,] [b]ut it is not good as against the world." *U.S. Dept. of Justice v. Fed. Labor Rel. Authority*, 39 F.3d 361, 369 (D.C. Cir. 1994).

The petitioner has cited "no case in which a federal or state court has ruled that some form of union privilege bars a prosecutor or grand jury from inquiring into conversations between a union member and his union representative." *In re Grand Jury Subpoenas Dated January 20, 1998*, 995 F. Supp. 332, 334 (E.D.N.Y. 1998). He thus urges the court to recognize a new common law evidentiary privilege for confidential communications between a public employee and a union steward.

New Hampshire Rule of Evidence 501 recognizes that the court has the inherent power to "develop new rules of privilege on common-law principles in cases coming before it." N.H. R. Ev. 501 Reporter's Notes. "Consideration of the creation of a new privilege must begin with the premise that all privileges are exceptional, and are therefor[e] to be discouraged. The investigation of truth and the enforcement of testimonial duty demand the restriction, not the expansion, of these privileges." *Dixon v. Rutgers*, 521 A.2d 1315, 1317 (N.J. Super. Ct. 1987) (quotation, brackets

and ellipses omitted). "For more than three centuries it has now been recognized as a fundamental maxim that the public has a right to every man's evidence. . . . [W]e [thus] start with the . . . assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional." *Jaffee v. Redmond*, 518 U.S. 1, 9 (1996) (quotation and ellipsis omitted). "Nowhere is the public's claim to each person's evidence stronger than in the context of a valid grand jury subpoena." *In re Sealed Case*, 676 F.2d 793, 806 (D.C. Cir. 1982); *see Branzburg v. Hayes*, 408 U.S. 665, 688 (1972). Indeed, "[o]nly a very limited number of recognized privileges provide legitimate grounds for refusing to comply with a grand jury subpoena, and each of these is firmly anchored in a specific source—the Constitution, a statute, or the common law." *In re Sealed Case*, 676 F.2d at 806.

■ We must be particularly "circumspect about creating new privileges based upon perceived public policy considerations." *In re Grand Jury*, 103 F.3d 1140, 1154 (3d Cir.), *cert. denied*, 520 U.S. 1253 (1997). It is only when "the need for the privilege is so clear" and "the desirable contours of [it] are so evident" that it is proper "for [the] court to craft [the privilege] in common law fashion under Rule 501." *Id.* (quotations and brackets omitted). Otherwise, it is for the legislature to create the privilege because it "is institutionally better equipped" to decide whether adopting a new privilege is in society's best interests. *Id.*; *see Branzburg*, 408 U.S. at 706 (suggesting that legislature should create new privileges, not judiciary).

For the above reasons, "with very limited exceptions, federal courts have generally declined to grant requests for new privileges." *Pearson v. Miller*, 211 F.3d 57, 67 (3d Cir. 2000) (citing cases in which courts have declined to adopt academic peer-review privilege, "protective function" privilege for Secret Service, corporate ombudsman privilege, insured-insurer privilege, privilege for records of unemployment hearings, and probation officer privilege).

■ Professor Wigmore has described four criteria that may be useful when analyzing whether to create a new evidentiary privilege:

(1) The communications must originate in a *confidence* that they will not be disclosed.

(2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

(3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered*.

(4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation.

8 J. WIGMORE, EVIDENCE § 2285 (McNaughton rev. 1961). Only if all four of these conditions are satisfied should a privilege be recognized. *Id.*

Applying these principles to the instant case, we decline to recognize a common law privilege that shields communications between union representatives and union employees from a grand jury subpoena. Even if we were to assume that the first two prongs of the Wigmore test were met, the petitioner "has still failed to show that the union relationship is so highly valued by an ordered society that its confidences warrant protection even at the cost of losing evidence important to the administration of justice." *In re Grand Jury Subpoenas Dated January 20, 1998*, 995 F. Supp. at 335. The petitioner cannot claim that the confidential relationship between union representative and union member "has the same strong historic roots as those generally afforded the protection of a common law privilege." *Id.* "This is not the type of relationship such as an attorney-client, husband-wife, or clergy-communicant that over time the common law has considered important enough to sustain as privileged." *Walker*, 142 F.R.D. at 500-01. "Neither does the union relationship appear more deserving of protection than other important confidential relationships [that] courts have refused to recognize as privileged." *In re Grand Jury Subpoenas Dated January 20, 1998*, 995 F. Supp. at 335; *see also Walker*, 142 F.R.D. at 501.

Moreover, whatever state interest there may be in encouraging confidential communications between union members and their representatives is not so strong that, in our view, it outweighs the State's interest in the grand jury context in having all relevant evidence of criminal conduct explored. *In re Grand Jury Subpoenas Dated January 20, 1998*, 995 F. Supp. at 337. The State's interest in having every relevant fact developed is particularly compelling in the grand jury context, for "its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments"; therefore, "its investigative powers are necessarily broad." *Branzburg*, 408 U.S. at 688.

■ Under these circumstances, we cannot say that the need for the privilege is "so clear" and the desirable contours of it "so evident" that we feel compelled to create it. *In re Grand Jury*, 103 F.3d at 1154 (quotations omitted). Therefore, we decline the petitioner's invitation to create a new common law privilege to protect communications between a union representative and a union employee from disclosure to a grand jury pursuant to a valid subpoena.

Finally, the petitioner contends that the trial court's decision violates the State and Federal Contract Clauses. *See* N.H. CONST. pt. I, art. 23; U.S. CONST. art. I, § 10. Part I, Article 23 of the New Hampshire Constitution prohibits the making of retrospective laws. A retrospective law is one that "takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." *Opinion of the Justices (Furlough)*, 135 N.H. 625, 630 (1992) (quotation and ellipsis omitted). Article I, Section 10 of the Federal Constitution declares that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts." "Although the New Hampshire provision affords more protection than its federal counterpart, this court has relied on federal contract clause cases to resolve issues raised under part I, article 23 where contract impairment, and not simply retroactive application of a law, was alleged." *Id.* (citations omitted). Article I, Section 10 of the Federal Constitution and Part I, Article 23 of the State Constitution thus "offer equivalent protections where a law impairs a contract, or where a law abrogates an earlier statute that is itself a contract." *Id.*

The petitioner's reliance upon the State and Federal Contract Clauses is misplaced as they pertain to *legislation* that impairs contractual rights. *See id.*; *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). Generally, the State and Federal Contract Clauses "prohibit . . . [the] adopt[ion] [of] laws that would interfere with the contractual arrangements between private citizens." R. ROTUNDA & J. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 15.8, at 637 (3d ed. 1999). As there is no legislation at issue in this appeal, neither clause applies.

*Affirmed.*

BRODERICK, C.J., and DUGGAN, GALWAY and HICKS, JJ., concurred.