OPINION OF THE COURT
Harold Baer, Jr., J.
Petitioner has brought on this CPLR article 78 proceeding to obtain an order, pursuant to CPLR 2304, quashing a *700 subpoena issued by respondent Susan E. Shepard, Commissioner of Investigation of the Department of Investigation of the City of New York (DOI). Respondent Michael Caruso, Inspector General of the DOI, cross-moves to compel petitioner’s testimony.
Petitioner is president of the Correction Officer’s Benevolent Association, Inc. (Union). He is on official leave from his job as a correction officer. His full time and energy are consumed in the representation of Union members on all matters arising out of their employment with the city.
The underlying brouhaha began on August 7, 1990, when a group of inmates assaulted a correction officer, Steven Narby, at the Otis Bantum Correctional Center on Rikers Island. Thereafter correction officers staged a job action, and blocked a bridge leading to Rikers Island. On August 14, 1990, a disturbance occurred at the Bantum Center, during which correction officers allegedly used force on inmates, and injuries resulted. Thereafter, the Mayor of the City of New York asked respondent Shepard to investigate the altercations that occurred on August 14 and the events that led to them. Respondent Shepard, as part of this investigation, issued to petitioner the administrative subpoena ad testificandum (commonly known as an "office subpoena”) here challenged.
Petitioner was present at neither the assault on Officer Narby nor the disturbance at the Bantum Center. Prior to the job action, petitioner received telephone calls from Union members concerning their complaints about working conditions and, in particular, "the facts surrounding the brutal assault of Correction Officer Steven Narby”. During the job action, petitioner engaged in confidential communications with Union officials and attorneys and negotiated with high-level city officials, as a result of which the job action was peacefully resolved.
Given his role in the events, it is clear, petitioner argues, that DOI is seeking to question him solely in his capacity as Union leader. The questioning, he contends, would necessarily breach the zone of confidentiality that must exist between union members and their leaders, and, insofar as the interrogation touched upon negotiations, would produce a chilling effect on future labor negotiations and the associational rights of union members and would interfere with "confidential disclosures made between union officials and the City of New York”.
*701 Petitioner is neither a target nor a subject of the DOI investigation. The DOI seeks to chat with Mr. Seelig because it believes that he has relevant information on the response of the Department of Correction to the events, especially "whether, and if so when [Department] supervisors and management received information about the events being investigated.” The DOI also wants to learn what information petitioner provided to city officials in advance of the job action about the likelihood that such action would come to pass; who received that information; what response petitioner received to his warnings; and how the Department reacted to conditions that developed during the job action.
The DOI has stated clearly that it has no desire to harass petitioner or to search out a device to discipline him. Accordingly, it has committed itself to a procedure intended to protect petitioner’s rights as the head of the Union. The DOI has agreed to permit counsel to be present during the exchange. Petitioner’s testimony, taken under oath, will be transcribed and his counsel will be allowed to interpose objections and directions not to answer what counsel deems to be improper queries. Only after any unresolved objections are ruled upon in the appropriate forum and petitioner declines to comply with rulings would DOI contemplate disciplinary action based on petitioner’s refusal to answer. It is significant that the DOI in highlighting this procedure appears to concede that petitioner has a legitimate ground for concern. The DOI, that is, appears to recognize that petitioner should "not be required to disclose privileged communications.”
DISCUSSION
Petitioner does not have, and, as I understand him, does not even claim to have, a broad common-law privilege, an analogue of the attorney-client privilege. There is, however, plainly a need, for the benefit of society as a whole, for unions to be free to function without harassment and interference from government. Accordingly, there arises, in the context of rules regulating relations between management and labor, a species of privilege for labor union leaders. If unions are to function, leaders must be free to communicate with their members about the problems and complaints of union members without undue interference. Members must be able to have confidence that what they tell their representatives on such subjects cannot be pried out of the representatives by an *702 overzealous governmental agency. Union members must know and be secure in feeling that those whom they elect from among their ranks will be their spokespersons and representatives, not the unwilling agents of the employer. The union leadership councils must be free to confer among themselves, exchange views, make plans and arrive at negotiating strategies without intrusion from the organs of official power.
In City of Newburgh v Newman (70 AD2d 362 [3d Dept 1979]), the Appellate Division upheld a ruling by the Public Employment Relations Board that Newburgh had engaged in an improper employment practice when the Police Commissioner ordered a police officer, who was the president of a police union, to answer questions about his observations on the occasion of a meeting with one of his union members. Said the court: "Questioning of a union official as to his observations and communications with a union member facing disciplinary proceedings, if permitted, would tend to deter members of the union from seeking advice and representation with regard to pending charges, thereby seriously impeding their participation in an employee organization.” (70 AD2d, at 365-366.)
Thus, it would be an improper employment practice if Commissioner Shepard compelled petitioner to answer questions about reports or complaints related to the Narby incident or the trouble at Rikers Island in August 1990 if those reports and complaints had been made to petitioner in his role as Union President by Union members. As I suggested earlier, respondent Commissioner seems to recognize this privilege. As was not the case in City of Newburgh (supra), the questioner here has wisely committed herself to respect the privilege by allowing petitioner’s counsel to object to questions that would violate it and to direct petitioner not to answer. Thus far, it seems to me, petitioner’s legitimate concern for the confidentiality of internal Union communications on matters concerning labor relations is protected.
Petitioner goes further and insists that he should not be required to answer any questions about negotiations. Insofar as a labor union privilege is involved here, it does not extend to communications made by petitioner to non-Union members, to outsiders such as the high-level management of the Department of Correction. A client may consult an attorney about the legality of past actions by the client and what action under the law the client ought to take. The attorney cannot be compelled to testify about what the client told him or her *703 (assuming that it was conveyed confidentially in a professional relationship). But if the attorney then communicates with a police officer or other government agent, that communication, having been made to an outsider to the privilege, is not protected. Similarly unprotected are any communications by petitioner to those outside his Union. The court in City of Newburgh (70 AD2d, supra, at 366) stated: "Any privilege established by the decision of the board is strictly limited to communications between a union member and an officer of the union, and operates only as against the public employer, on a matter where the member has a right to be represented by a union representative, and then only where the observations and communications are made in the performance of a union duty. The purpose is the protection of the right to fully participate in an employee organization, with the full benefits thereof’.
The procedure that will be followed in this case thus offers protection to petitioner’s rights. A petitioner may rarely obtain an order quashing a subpoena ad testificandum in advance of the interrogation. The proper procedure requires that the subpoena be obeyed and objections to specific questions interposed. If the objections cannot be resolved informally, appropriate review can be sought on a record that permits an informed determination of the issues. " 'Simply stated, privileges may not be asserted in advance of questions actually propounded.’ ” (New York State Commn. on Govt. Integrity v Congel, 156 AD2d 274, 280 [1st Dept 1989], appeal dismissed 75 NY2d 836 [1990]; see, Matter of Cunningham v Nadjari, 39 NY2d 314 [1976]; People v Slochowsky, 116 Misc 2d 1069 [Sup Ct 1982].)
Petitioner contends that compelling his testimony would have a chilling effect on the associational rights of his member?. Insofar as intra-Union communications on labor relations matters are concerned, the privilege I have described above is available to protect the members’ rights. To the extent that questioning about communications made by petitioner to non-Union members is concerned, such questioning, allowed by the labor relations privilege described above, may well give rise to serious problems for the preservation of First Amendment rights. (See, New York State Commn. on Govt. Integrity v Congel, 142 Misc 2d 9 [Sup Ct 1988, Glen, J.], mod 156 AD2d 274 [1st Dept 1989], supra.) As both the Supreme Court and the First Department held in that case, the proper procedure is for the witness to assert the First Amendment *704 privilege during questioning, not to refuse to appear altogether.*
CONCLUSION
Accordingly, the cross motion is granted arid the application of petitioner is denied. The petition is dismissed.

 This is not a case, as petitioner contends, in which an employee is being dismissed because he negotiated too vociferously. I also do not agree with petitioner that the interrogation is barred by the amnesty provision of an agreement entered into between the Union and the city in November 1990 in resolution of the dispute at Rikers Island. The provision prohibits the city from harassing or taking other retaliatory action against any employee involved in the wildcat job action. Questioning of the kind to be undertaken here in an investigation of the Department of Correction is not harassment or retaliation, and petitioner does not seem to be one of those intended to be protected by this provision.
The city argues that the New York City Board of Collective Bargaining has exclusive jurisdiction to determine whether specific questions constitute an improper employment practice and that petitioner should present a petition to the Board if compulsion of answers to improper questions is sought. In view of my disposition of this case, I need not resolve this question, although I have some doubt about the Commissioner’s proposition on the facts here since First Amendment rights are intertwined with those having a foundation in labor law.