[No. B162513. Second Dist., Div. Eight. Dec. 29, 2003.]

AMERICAN AIRLINES, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
RICHARD DiMARCO, Real Party in Interest.

**COUNSEL**

Morgan, Lewis & Bockius, Susan G. Fillichio, Robert Jon Hendricks and Dominick C. Capozzola for Petitioners.

Littler Mendelson and Garry G. Mathiason for AIRCON, Chamber of Commerce of the United States and LPA, Inc., as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Schwartz, Steinsapir, Dohrmann & Sommers, Henry M. Willis and D. William Heine for Real Party in Interest.

Law Offices of Carroll & Scully, Donald C. Carroll and Charles P. Scully II for California Labor Federation, AFL-CIO, as Amicus Curiae on behalf of Real Party in Interest.

## OPINION

## RUBIN, J.—

### INTRODUCTION

During his wrongful employment termination lawsuit against American Airlines (American), Jawad Alamad indicated that his union representative had information that would support his claims of racial discrimination. American took the union representative's deposition, but he refused to answer relevant questions on the basis that his discussions with other employees were protected by a union representative-union member evidentiary privilege. Acknowledging the existence of such a privilege, the trial court denied American's motion to compel the union representative's deposition testimony. We hold neither California nor federal law recognizes such a privilege to prevent the disclosure of relevant information in a civil action. Accordingly, we direct the trial court to vacate its ruling and grant American's motion to compel.

### FACTUAL AND PROCEDURAL BACKGROUND

#### 1. *The Lawsuit.*

Alamad, a former American aircraft mechanic, sued American and 11 of his supervisors for wrongful termination, harassment, and discrimination under the Fair Employment and Housing Act (FEHA). Alamad alleged, among other things, that throughout his employment he was continually discriminated against and harassed due to his Middle Eastern heritage, that he

was subjected to a hostile work environment, and that he was terminated in November 2000 in retaliation for complaining about the discrimination and harassment. American contends Alamad was terminated for dishonesty after he was caught working for another employer on that company's aircraft before the end of his workshift for American.

## 2. *The Discovery Dispute.*

During discovery, Alamad identified persons having knowledge supporting his claims. One of those persons was Richard DiMarco, an American employee and Vice President of Local 564 of the Transport Workers Union of America, AFL-CIO (the Union). The Union, formed under the federal Railway Labor Act (RLA), represents American aircraft mechanics and other employees. DiMarco investigated the grievance Alamad filed with American after he was discharged. He also helped in the presentation of that grievance in arbitration proceedings held in accordance with the collective bargaining agreement between American and the Union.[1]

During DiMarco's deposition in the civil action, he testified that between 1996 and 1999 he regularly heard American employees using racially derogatory names toward Alamad. He said he could identify those employees. DiMarco further testified that he knew of six shop stewards who had told him they were actively retaliated against by American. DiMarco also testified that some of the American mechanics who had previously provided declarations to American regarding Alamad were "coerced" into doing so. Those mechanics had testified in American's favor at the previous arbitration concerning Alamad's employment termination. That testimony generally supported American's position that Alamad was terminated for dishonesty and that he was not the subject of racial discrimination.

When DiMarco was pressed for details regarding the alleged coercion, the names of the employees who were allegedly coerced, the names of the employees who allegedly used derogatory slurs against Alamad, and the names of employees who claimed active retaliation, DiMarco repeatedly refused to testify. DiMarco further refused to answer whether he knew the allegedly coerced testimony was untruthful. DiMarco claimed the information was privileged.

American and three of the individually named supervisors moved to compel answers to deposition questions concerning the identity of the individuals who made the slurs and further details concerning the alleged

---

[1] The area board of adjustment ultimately denied Alamad's grievance and upheld his termination, after which Alamad brought the underlying lawsuit.

coercion, including the names of the coerced employees. (See Code Civ. Proc., § 2025, subd. (o).) American argued DiMarco was a percipient witness whose answers would provide relevant, unprivileged information necessary to American's defense of Alamad's claims. In the alternative,·American sought to exclude DiMarco's testimony at trial. Alamad's counsel opposed the motion, arguing DiMarco was justified in his refusal to answer questions because there is a qualified privilege for confidential communications between a union representative and union members concerning investigations into union matters and grievances.

DiMarco, represented by separate counsel, also opposed the motion. In his opposing declaration, DiMarco stated, "I have learned, from what employees told me in the course of my duties as a Union representative in dealing with employees' complaints concerning violation of the [Collective Bargaining Agreement with American], that some employees have used racially offensive terms to refer to Mr. Alamad. I have not identified any of those employees to management because that could subject those employees to discipline. [¶] I refused to answer questions at my deposition in which management asked for the names of these individuals, since revealing this information given to me by employeés in the course of my duties as a Union representative would have put the Union and me in an untenable conflict of interest if management proceeded to discipline any of these employees for that conduct."

### 3. *The Trial Court's Ruling.*

The trial court denied American's motion to compel and stated, "I think it is a matter of first impression in California, and it's perhaps an issue best addressed to the Court of Appeal. But I agree, I think there would be, it should be a privilege as to communications between a union officer and members . . . ."

American filed a petition for writ of mandate challenging the trial court's ruling. American urged us to vacate the trial court's ruling because neither California nor federal law recognizes a union member communication privilege. While we agreed the trial court erred in finding the privilege, we summarily denied the petition because American had not adequately demonstrated it would suffer irreparable harm if the discovery order was not immediately vacated. (See *Omaha Indemnity Co. v. Superior Court* (1989) 209 Cal.App.3d 1266, 1272–1273 [258 Cal.Rptr. 66] [writ relief is not a foregone conclusion even if a trial court errs in its ruling]; *Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1060–1061 [95 Cal.Rptr.2d 864] [writ proceedings are disfavored for reviewing discovery rulings]; *Pacific Tel. & Tel. Co. v. Superior Court* (1970) 2 Cal.3d 161, 169–170 [84 Cal.Rptr. 718, 465 P.2d 854] [writs will not issue merely because a discovery order is erroneous].)

The Supreme Court then granted American's petition for review and transferred the case back to us with directions that we vacate our summary denial and issue an order to show cause. We issued the order to show cause, received further briefing, and heard oral argument. We conclude no union member privilege exists and direct the trial court to grant American's motion to compel.

## DISCUSSION

### 1. *Evidence Code Section 911.*

Evidence Code section 911 provides, in relevant part: "Except as otherwise provided by statute: [¶] . . . [¶] (b) No person has a privilege to refuse to disclose any matter or to refuse to produce any writing, object, or other thing." This section declares the California Legislature's determination that "evidentiary privileges shall be available only as defined by statute. [Citation.] Courts may not add to the statutory privileges except as required by state or federal constitutional law [citations], nor may courts imply unwritten exceptions to existing statutory privileges. [Citations.]" (*Roberts v. City of Palmdale (1993) 5 Cal.4th 363, 373 [20 Cal.Rptr.2d 330, 853 P.2d 496]* (*Roberts*); see *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652, 656 [125 Cal.Rptr. 553, 542 P.2d 977] [privileges contained in Evidence Code are exclusive and courts are not free to create new privileges as matter of judicial policy unless constitutionally compelled]; *Garstang v. Superior Court* (1995) 39 Cal.App.4th 526, 532 [46 Cal.Rptr.2d 84] ["In California there is no privilege to refuse to disclose any matter, or to refuse to produce any writing, object, or thing, unless the privilege is created by statute"]; *Cloud v. Superior Court* (1996) 50 Cal.App.4th 1552, 1558–1559 [58 Cal.Rptr.2d 365] [unlike the federal courts, California courts are not free to create new privileges as a matter of judicial policy]; *United States v. Nixon* (1974) 418 U.S. 683, 710 [41 L.Ed.2d 1039, 94 S.Ct. 3090] [privileges are not lightly created nor expansively construed, for they are in derogation of the search for the truth].)

The burden of establishing that a particular matter is privileged is on the party asserting the privilege. (*San Diego Professional Assn. v. Superior Court* (1962) 58 Cal.2d 194, 199 [23 Cal.Rptr. 384, 373 P.2d 448]; *Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355, 398 [15 Cal.Rptr. 90, 364 P.2d 266] [party opposing disclosure on basis of privilege bears burden of establishing application of the privilege]; *Gonzalez v. Superior Court* (1995) 33 Cal.App.4th 1539, 1548 [39 Cal.Rptr.2d 896] [where there is a prima facie showing of relevance, party opposing disclosure on basis of conditional privilege has burden to establish preliminary facts essential to claim of privilege].) Because the issue of whether a new evidentiary privilege

should be recognized is a question of law, we review it de novo. (See *People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 432 [101 Cal.Rptr.2d 200, 11 P.3d 956]; *International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611 [38 Cal.Rptr.2d 150, 888 P.2d 1279]; *Morris v. Harper* (2001) 94 Cal.App.4th 52, 58 [114 Cal.Rptr.2d 62].)

## 2. *Labor Code Section 923 Does Not Create a Union Privilege.*

Citing *Welfare Rights Organization v. Crisan* (1983) 33 Cal.3d 766 [190 Cal.Rptr. 919, 661 P.2d 1073] (*Crisan*), DiMarco argues the so-called union representative-union member privilege may be implied whenever a state or federal statute allows employees to have lay representation. He contends the two statutes implying such a privilege are Labor Code section 923 and the RLA. We disagree.

First, we place *Crisan* in proper context, for that case does not stand for the proposition that a general evidentiary privilege applies every time a statute authorizes lay representation. In *Crisan*, Welfare and Institutions Code section 10950 (section 10950) provided that an applicant for public social services who was dissatisfied with a county decision concerning his or her receipt of such services under the Aid to Families with Dependent Children (AFDC) program could "in person or though an authorized representative . . . be accorded an opportunity for a fair hearing . . . ." (*Crisan, supra,* 33 Cal.3d at p. 770.) The issue before the court was "whether communications between welfare claimants and lay representatives authorized to represent them in administrative fair hearings under [the AFDC] are privileged." (*Id.* at p. 768.)

The court reiterated that "unless a privilege is expressly or impliedly based on statute, its existence may be found only if required by constitutional principles, state or federal." (*Crisan, supra,* 33 Cal.3d at p. 769.) In construing section 10950, the court recognized that AFDC recipients have a federal due process right to an evidentiary hearing before their benefits are terminated. The court concluded that the term "authorized representative" in section 10950 signified an expansion of the right of legal representation that previously had been accorded welfare claimants: "Before the enactment of section 10950, the applicable statute (Welf. & Inst. Code, § 104.1) had provided: 'At the hearing the applicant or recipient may appear in person with counsel of his own choosing, or in person and without such counsel.' The substitution of 'authorized representative' for 'counsel' suggests that the Legislature recognized that attorneys alone could not satisfy the representational needs of the state's welfare claimants and that assistance through representation was necessary to insure the meaningfulness of the 'fair hearing' right provided by statute. [¶] . . . [T]he considerations which support the [attorney-client] privilege are so generally accepted that the Legislature must

have implied its existence as an integral part of the right to representation by lay persons. Otherwise that right would, in truth, be a trap by inducing confidential communications and then allowing them to be used against the claimant. We do not attribute such a sadistic intent to the Legislature." (*Crisan, supra,* 33 Cal.3d at pp. 770–771.)

Thus, based upon the language of section 10950, its legislative history, and the court's characterization of the communication as "legal advice," the court construed the statute "as including a guarantee of confidentiality in its extension of the right of representation to include representation by lay persons as well as by counsel in connection with welfare fair hearings." (*Crisan, supra,* 33 Cal.3d at pp. 768, 772.) The court did not create a new evidentiary privilege as a matter of judicial policy; rather, it held the Legislature impliedly crafted the privilege as it expanded section 10950.

 To drive home the limits of its holding, the court warned that its decision was based upon the specific terms of the statute: "[T]here are . . . other statutes which permit lay representation before certain tribunals. (E.g., Unemp. Ins. Code, § 1957; Lab. Code, § 5700.) Nothing we have said with respect to section 10950 of the Welfare and Institutions Code demands an identical interpretation of those other enactments, each of which will have to be examined against its own statutory, historical and constitutional background." (*Crisan, supra,* 33 Cal.3d at p. 772; but see 2 Witkin, Cal. Evid. (4th ed. 2000) Witnesses, § 103, p. 356 [describing the *Crisan* privilege as "a new privilege, analogous to that of attorney-client, for authorized representatives of welfare claimants and recipients in administrative fair hearings under the Aid to Families With Dependent Children program"].) *Crisan*'s holding is narrow: a court may imply a privilege under statutes authorizing lay representation only if the statutory language and legislative history plainly demonstrate the Legislature's intent to create such a privilege.

Labor Code section 923 (section 923) differs substantially from Welfare and Institutions Code section 10950. Section 923 provides, in relevant part, that it is the public policy of the state that "the individual workman have full freedom of association, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." (See *Service Employees International Union v. Hollywood Park, Inc.* (1983) 149 Cal.App.3d 745 [197 Cal.Rptr. 316] [this section declares the public policy supporting the freedom of employees to organize and the collective bargaining process].)

■ American argues that section 923 does not apply to the Union, which was established under the RLA. (See *Henry v. Intercontinental Radio, Inc.* (1984) 155 Cal.App.3d 707, 715 [202 Cal.Rptr. 328] [private cause of action under section 923 preempted by federal labor law]; *Miller v. United Airlines, Inc.* (1985) 174 Cal.App.3d 878, 887–889 [220 Cal.Rptr. 684] [RLA preempts state law in certain areas of labor relations].) We need not address that issue, for assuming the Union may generally avail itself of the benefits of section 923, there simply is no indication in the words of the statute or its history that the Legislature intended to include an evidentiary communication privilege between union members and their representatives. The statute in *Crisan* expressly pertained to authorized advocates before a tribunal under a narrowly drawn legislative scheme in which laypersons were permitted to act in lieu of attorneys. On the other hand, section 923 is only a general declaration of the well-accepted public policy that employees have the freedom to designate representatives "to negotiate the terms and conditions" of employment. Section 923 does not create any specific proceedings or hearings from which it can be inferred the existence of a privilege would apply. Stated differently, there is no foundation from which to make the legal leap from the freedom of designation, self-organization and collective bargaining to an evidentiary privilege for communications between a union representative and a union member. (See *Tanzola v. De Rita* (1955) 45 Cal.2d 1, 6 [285 P.2d 897] [privileges preclude relevant evidence and thus should be strictly construed within the narrow limits of the statutes].)

Indeed, creating the type of evidentiary privilege proposed by DiMarco could severely compromise the ability of employers to conduct investigations pertaining to claims of harassment, discrimination, unlawful conduct, or other employer rules violations, all to the detriment of union members. For example, the FEHA enunciates this state's public policy to eliminate discrimination in the workplace. (See Gov. Code, §§ 12920 & 12920.5; *Soldinger v. Northwest Airlines, Inc.* (1996) 51 Cal.App.4th 345, 366–367 [58 Cal.Rptr.2d 747].) Under FEHA, an employer, as well as a labor union, has an obligation to "take all reasonable steps necessary to prevent discrimination and harassment from occurring" in the workplace. (Gov. Code, § 12940, subd. (k).) The affirmative and mandatory duty to ensure a discrimination-free work environment requires the employer to conduct a prompt investigation of a discrimination claim. (See *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.* (2002) 103 Cal.App.4th 1021, 1035–1036 [127 Cal.Rptr.2d 285].) To carry out its obligation to prevent discrimination by investigating claims, an employer likely will need to obtain information from a wrongdoer's co-workers who were in a position to witness the misconduct and identify the wrongdoer. In a unionized workplace, an employer's investigation could be hampered by a union representative-union member privilege, thus conceivably undermining an employer and a labor union's statutory obligation to ensure a discrimination-free work environment.

Although there may be various countervailing policy reasons why a union representative should *not* be compelled during civil litigation to disclose factual information obtained from other union members he or she represents, that policy determination (and the parameters of any concomitant evidentiary privilege) is the province of the Legislature, not this court. (See *Roberts, supra,* 5 Cal.4th at pp. 372–373; *Dickerson v. Superior Court* (1982) 135 Cal.App.3d 93, 99 [185 Cal.Rptr. 97].) This is especially true in an area where the Legislature has declared the state's public policy in such detail. (See *Rojo v. Kliger* (1990) 52 Cal.3d 65, 80 [276 Cal.Rptr. 130, 801 P.2d 373] [describing FEHA as "comprehensive scheme" for combating employment discrimination].)

Finally, even assuming any privilege could be implied under section 923, under the statute's very language it would exist at most in the context of negotiating "the terms and conditions" of employment. This case pertains to no such negotiations.

### 3. *The RLA Does Not Create a Union Privilege.*

DiMarco further argues that provisions of the RLA, which grant employees the right to organize and bargain collectively through representatives, and which establish a system of regional and system-wide boards of adjustment to hear union contract disputes and grievances, create a communication privilege between union representatives and members.[2] Acknowledging there are no cases where a court has ever found a union privilege under the RLA,

---

[2] The RLA applies to common carriers like American. (45 U.S.C. § 181 et seq.). Thus, DiMarco and other American employees are covered by the RLA, rather than the National Labor Relations Act (NLRA). (29 U.S.C. § 151 et seq.) The purpose of the RLA is to bring about stable relationships between labor and management in the national transportation industry in order to "keep transportation moving." (*Thibodeaux v. Executive Jet Intern., Inc.* (5th Cir. 2003) 328 F.3d 742, 754.)

DiMarco directs us to the following RLA provision: "Employees shall have the right to organize and bargain collectively through representatives of their own choosing. . . . No carrier, its officers, or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees . . . ." (45 U.S.C. § 152.)

The second RLA provision on which DiMarco relies is: "The disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, . . . shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to an appropriate adjustment board . . . . [¶] It shall be the duty of every carrier and of its employees, acting through their representatives, selected in accordance with the provisions of this title, subchapter, to establish a board of adjustment of jurisdiction not exceeding the jurisdiction which may be lawfully exercised by system, group, or regional boards of adjustment . . . ." (45 U.S.C. § 184.)

DiMarco contends it is enough, under *Crisan,* to show that the RLA permits lay representation of union members. But DiMarco once again misreads *Crisan*'s holding. Even the *Crisan* court recognized that its conclusion did not apply to other statutes permitting lay representation before tribunals, and that such statutes must be analyzed under their own terms and background. (*Crisan, supra,* 33 Cal.3d at p. 772.)

■ We discern nothing in the RLA that expressly or implicitly indicates Congress intended to create a communications privilege between union representatives and employees. Recognizing the absence of any such intent, DiMarco argues we should adopt a union privilege under *Cook Paint and Varnish Co.* (1981) 258 N.L.R.B. 1230 (*Cook Paint*), a case decided under the NLRA. *Cook Paint* is not helpful to DiMarco's argument.

In *Cook Paint,* an employee's grievance concerning certain injuries was submitted to arbitration by his union. The union's shop steward was involved in representing the injured employee during the prearbitration settlement process. The matter was not settled and proceeded to arbitration. Before the arbitration, the employer and its counsel questioned the shop steward regarding his conversations with the injured employee and demanded that he turn over contemporaneous notes he had kept of the incident. The steward was threatened with disciplinary action if he did not cooperate. (*Cook Paint, supra,* 258 N.L.R.B. at pp. 1230–1231.)

The National Labor Relations Board (NLRB) ruled that because the steward was not an eyewitness and his role in the entire incident arose solely because of his status as union steward, the employer's coercive conduct constituted an unfair labor practice by violating NLRA provisions prohibiting employers from restraining or coercing employees from the exercise of union activities. (*Cook Paint, supra,* 258 N.L.R.B. at p. 1232.) The NLRB further concluded, "[W]e wish to emphasize that our ruling in this case does not mean that all discussions between employees and stewards are confidential and protected by the [NLRA]. Nor does our decision hold that stewards are, in all instances, insulated from employer interrogation. We simply find herein that, because of [the steward's] representational status, the scope of [the employer's] questioning, and the impingement on protected union activities," the employer's interview of the steward violated the NLRB. (*Ibid.*)

Not only is *Cook Paint* not controlling because it involved an interpretation of the NLRA and not the RLA (see *Johnson v. Express One Intern., Inc.* (5th Cir. 1991) 944 F.2d 247, 252; *Pacific Fruit Exp. v. Union Pacific* (9th Cir. 1987) 826 F.2d 920, 922–923), there is no compelling reason why its narrow holding should be adopted to create a new evidentiary privilege in civil actions seeking damages under California law. *Cook Paint* limited its ruling

to those situations in which the employer sought to interrogate a steward about the prearbitration assistance the steward gave to an employee about the upcoming arbitration, concluding such an interrogation would constitute an unfair labor practice under the NLRA. In contrast, here DiMarco is a percipient witness to allegedly discriminatory conduct that he has observed over a four-year time period; nor was he threatened with adverse job action.[3]

■ DiMarco essentially asks us to equate an employer's unfair labor practice under the NLRA with the creation of an evidentiary privilege under California law. As we have already noted, it is not our role to create such privileges. Whether an allegedly unfair labor practice should rise to the level of creating an evidentiary privilege, and under what particular circumstances, are questions more appropriately posed to and answered by the legislative branch.[4]

### 4. *Privacy Rights Do Not Create a Union Privilege.*

DiMarco lastly claims American's deposition questions are improper because they invade his constitutional right of privacy and freedom of association. We disagree.

"The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion and our freedom to associate with the people we choose. . . ." (*White v. Davis* (1975) 13 Cal.3d 757, 774 [120 Cal.Rptr. 94, 533 P.2d 222]; see also *City of*

---

[3] We obviously express no opinion as to whether American's conduct constitutes an unfair labor practice under applicable federal law.

DiMarco further cites *Seelig v. Shepard* (1991) 152 Misc.2d 699 [578 N.Y.S.2d 965] to support his argument that statements made by employees to union representatives are protected in civil litigation by an evidentiary privilege. In that case, the court derived a privilege to block a state agency from seeking information from a public employee who was acting as the head of a correctional officers' labor union. Not only does *Seelig* have no application to facts of this case, but the decision was based upon an interpretation of New York law, which, contrary to California law, gives leeway to state judges to fashion evidentiary privileges in extraordinary circumstances. (See *Lamitie v. Emerson Electric Co.* (1988) 142 A.D.2d 293, 298–299 [535 N.Y.S.2d 650, 653].) Neither *Seelig* nor the NLRB cases cited by DiMarco govern California's evidentiary rules.

[4] Amici curiae in support of American argue that the creation of a union representative-union member evidentiary privilege is a matter that should be left for negotiation and included in the parties' collective bargaining agreement. We need not address this issue because it does not pertain to the facts of this case. We simply note that while such a contractual provision may have an impact on the parties' grievance or arbitration procedures under the RLA, it may not on its own compel a court to recognize such a procedural rule. (See *Oakland-Alameda County Coliseum Authorityv. CC Partners* (2002) 101 Cal.App.4th 635, 645 [124 Cal.Rptr.2d 363] [parties to arbitration agreement cannot contractually expand the scope of judicial review beyond that provided by statute].)

*Santa Barbara v. Adamson* (1980) 27 Cal.3d 123, 130 [164 Cal.Rptr. 539, 610 P.2d 436].) The United States Supreme Court "has recognized the vital relationship between freedom to associate and privacy in one's associations. . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." (*N.A.A.C.P. v. Alabama* (1958) 357 U.S. 449, 462 [2 L.Ed.2d 1488, 78 S.Ct. 1163].)

Citing *Britt v. Superior Court* (1978) 20 Cal.3d 844 [143 Cal.Rptr. 695, 574 P.2d 766] (*Britt*), DiMarco particularly emphasizes that his constitutional right of associational privacy protects him from answering American's deposition questions. In *Britt*, numerous owners and residents sued the San Diego International Airport for diminution of their property values, personal injuries, and emotional disturbance caused by the noise and pollution associated with the operation of the airport. The airport sought extensive discovery against each of the plaintiffs, including depositions and requests for production of documents. Specifically, the airport asked plaintiffs questions regarding (1) their membership in political organizations opposed to the airport, (2) any meetings they had attended concerning the airport and the topics discussed, (3) correspondence with such organizations, (4) the identity of others who had attended the meetings, (5) the content of discussions with others regarding the meetings and the identity of others who were part of those discussions, and (6) the amount and date of financial contributions to such organizations. (*Id.* at pp. 849–850.)

Several of the plaintiffs moved for a protective order, arguing their political associations were constitutionally privileged. The trial court denied the motions and granted the airport's motion to compel answers to deposition questions. The California Supreme Court found the order violated the plaintiffs' rights of privacy in group associations. The court stated, "As both the United States Supreme Court and this court have observed time and again . . . First Amendment freedoms, such as the right of association, 'are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference.' [Citations.] Indeed, numerous cases establish that compelled disclosure of an individual's private associational affiliations and activities, such as that at issue in [this] case, frequently poses one of the most serious threats to the free exercise of this constitutionally endowed right." (*Britt, supra,* 20 Cal.3d at p. 852.)[5]

---

[5] Neither the *Britt* majority nor the dissent discussed Evidence Code section 911's limitation on judicially created privileges. Although the *Britt* court does not appear to equate the associational right of privacy with an evidentiary privilege, its holding essentially presages by 15 years that court's decision in *Roberts, supra,* 5 Cal.4th 363, 373, that a court may add to statutory privileges when constitutionally compelled to do so.

■ Without diminishing the importance of a person's right of associational privacy, we conclude that right is not implicated in this case. The deposition questions posed to DiMarco did not ask him to reveal any private associational affiliations and activities. Everyone concerned already knew, of course, that DiMarco, Alamad, and other American employees were members of the Union. The questions generally related to the names of American employees DiMarco had heard using racial slurs toward Alamad and the names of those American employees whose arbitration testimony was allegedly coerced. These questions do not delve into the constitutionally protected right of associational privacy.[6]

DiMarco also cites *Garstang v. Superior Court, supra,* 39 Cal.App.4th 526 (*Garstang*), to support his argument that disclosing the names of American employees will invade his right of privacy, or the privacy rights of the unidentified employees. In *Garstang*, a university employee filed an action against the university and three coworkers for slander and intentional infliction of emotional distress. She then took the depositions of the three coworkers and questioned them concerning statements they made during a prelitigation confidential mediation conducted by the university's ombudsman concerning plaintiff's claim. They refused to answer the questions, contending the right of privacy protected the statements made during the mediation. (*Id.* at pp. 529–530.) Based upon evidence that the university gave its employees written assurances of strict confidentiality in mediation hearings before the ombudsman and that the deposition questions delved into private affairs discussed during the mediation, the appellate court held the right of privacy barred the disclosure. (*Id.* at pp. 534–535; but see *Rinaker v. Superior Court* (1998) 62 Cal.App.4th 155, 167–168 [74 Cal.Rptr.2d 464] [no right of privacy in inconsistent statements made during confidential mediation].)

Unlike the plaintiff in *Garstang*, American does not seek disclosure of statements made during a confidential mediation, which is the subject of its own special confidentiality provisions, separate from other privileges listed in the Evidence Code. (See Evid. Code, § 1119.)[7] Additionally, in *Garstang*, the court found that all parties to the lawsuit had impliedly agreed that the communications would be kept confidential. (*Garstang, supra,* 39 Cal.App.4th at p. 534.) Here, American made no promises about the confidentiality of conversations. Moreover, American seeks the names of employees who DiMarco claims to have *observed* making racial slurs toward

---

[6] We do not intend by this opinion to limit the trial judge's traditional authority to issue protective orders necessary to prevent any witness "from unwarranted annoyance, embarrassment, or oppression." (Code Civ. Proc., § 2025, subd. (i).)

[7] The *Garstang* statements did not qualify for the statutory mediation privilege because at the relevant time the statute required the parties' written agreement (*Garstang, supra,* 39 Cal.App.4th at pp. 532–532 & fn. 3.)

Alamad during a four-year period, as well as the names of employees whose testimony was allegedly coerced. There is no evidence in this case that any of the American employees who told DiMarco they had made discriminatory comments toward Alamad or that their arbitration testimony was coerced did so based upon explicit assurances of confidentiality. Furthermore, there is no compelling reason to conclude that employees who allegedly make racial slurs about other employees on an employer's property have a privacy interest in those statements or the fact that they made them. Likewise, we see no cognizable privacy interest that attaches to statements allegedly made by employees who claim their sworn arbitration testimony was coerced.

## CONCLUSION AND DISPOSITION

To summarize, this case presents a backdrop of competing social policies: a union member's right to organize and collectively bargain, a union's obligations to its members, an employer's duty to ferret out discriminatory practices and its right to defend itself in litigation, and a search for truth in the adversarial process. To this backdrop, we add the overlay of Supreme Court (*Crisan, supra,* 33 Cal.3d 766) and legislative (Evid. Code, § 911) mandate that courts are not free to create new evidentiary privileges. The Legislature is particularly well suited as the forum to give appropriate weight to these contending policies, and, accordingly, we decline real parties' invitation to create judicially a new privilege.

The petition is granted. Let a peremptory writ of mandate issue, directing the trial court to: (1) vacate its October 11, 2002 order denying American's motion to compel answers to deposition questions; and (2) issue a new order granting the motion, subject to any protective order that is consistent with the views expressed in this opinion.

American shall recover its costs in this writ proceeding.

Cooper, P. J., and Boland, J., concurred.

A petition for a rehearing was denied January 28, 2004, and the petition of real party in interest for review by the Supreme Court was denied April 21, 2004. Werdegar, J., did not participate therein.