RENDERED: APRIL 9, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0266-MR

RIVER CITY FRATERNAL ORDER OF POLICE
LODGE NO. 614, INC.                                             APPELLANT

                            APPEAL FROM JEFFERSON CIRCUIT COURT
v.                       HONORABLE BRIAN C. EDWARDS, JUDGE
                             ACTION NO. 18-CI-006171

LOUISVILLE/JEFFERSON COUNTY METRO
GOVERNMENT; and KENTUCKY LABOR
CABINET                                               APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, KRAMER, AND MAZE, JUDGES.

KRAMER, JUDGE: The overarching question presented in this appeal is whether
the appellee, Louisville/Jefferson County Metro Government, by and through its
police department ("LMPD"), committed an unfair labor practice by requiring one
of its employees, Sgt. David Mutchler, who was a member and – at the time of

these events – President of appellant River City Fraternal Order of Police, Lodge No. 614, Inc. ("FOP") to submit to an investigative interview from LMPD's Professional Standards Unit ("PSU"). This question was adjudicated by the Kentucky Labor Cabinet ("Cabinet") and reviewed by the Jefferson Circuit Court; and both tribunals answered in the negative. Upon review, we affirm.

We begin with a discussion of the relatively brief interview itself, which occurred on August 2, 2017, and concerned a disciplinary matter. Mutchler, testifying not as a party but as a witness, did so in relevant part as follows:

> Q: August 2. All righty. And it is 10:47. Okay. Sergeant Mutchler, thanks for having me over. Ah, as you are aware the Chief initiated an investigation into Lieutenant Donny George as filing of a hostile working environment. This investigation is to determine whether these documents that were submitted were deceptive in nature, okay? Ah, during the course of the investigation, there was a memo that turned up by Sergeant Armand [sic] White and that, ah, he indicated that he did not authorize the filing of this hostile working environment by Lieutenant Donny George. In his memo he indicated that he spoke with you as the FOP President regarding this situation. Ah, do you recall having a conversation with Sergeant White, ah, regarding this incident?
>
> MUTCHLER: Um, yes. Ah, and I do need to say that, um, I am obviously complying with the department and the Chief's orders to provide this statement. Um, and I'm, I will obviously do that. Ah, but I do wanna note that, ah, the statement is under protest as we believe, ah, the lodge believes that, ah, request for representation and conversations with the collective bargaining representative, ah, are somewhat privileged. But yes, I do recall a conversation with, ah, with Sergeant White.

Q: Okay. In his memo, ah, and just let the record show I'm looking at the, the memo right now. In his memo he states that, um, they spoke to you by phone and he stated that, that Sergeant Mutchler, he said, did say that, "He thought if I had a problem I would've come to him directly." Let, let me ask you this. At any time during your conversation with Sergeant White, did he indicate that he did not authorize the filing of this hostile working environment or did he indicate that this was filed without his permission?

MUTCHLER: I do not recall that we actually spoke about the hostile work environment filing I guess is, is the proper word. Um, I spoke with him, ah, and I did mention to him that normally, ah, officers would reach out on their own if they had some sort of issue. Um, but it's not, I mean, it's happened before where officers have called or COs have called on other officers, on another officer's behalf. Um, ah, what I recollect from the conversation is generally that, um, he just wanted to be in a situation where he knew who was going to be giving him his orders and his job tasks so he could follow that, ah, and that he did, you know, was, didn't want to be involved in conflicts with those above his rank.

Q: Mm-hm.

MUTCHLER: Um, he just wanted to do his job, basically. Um, I don't recall if, I don't recall the chronology as far as, I don't remember when I was informed that there even was a filing of a, of a hostile work environment. I just knew that I had spoken with Sergeant White, and previously [sic] speaking to him I had spoken with Lieutenant George but I, I don't remember, I don't recall that we did that, if that was discussed or not and I am definitely not saying that that didn't come up.

Q: Mm-hm.

MUTCHLER:  But I don't recall in the conversation if he mentioned the hostile working environment or, or even mentioned that he didn't want it to be filed.  I don't, unfortunately I talk to hundreds of people and I just don't recall whether that even came up.

Q:  Okay.

MUTCHLER:  Um, but it's very possible that it did.

Q:  Mm-hm.

MUTCHLER:  I have to say that.  I just, I simply don't recall.

Q:  Okay.  Ah, that's all I have for you.  Thank you so much for letting me come down and I will conclude this interview at 1052 hours.

In short, PSU asked Mutchler three questions:  (1) Did he recall having a conversation with Sgt. Armin White?  (2) If so, was the conversation about a "hostile working environment" complaint that Lt. Donny George filed on his behalf?  And if so, (3) had Sgt. White stated whether he had authorized George to file it on his behalf?  Essentially, Mutchler's answers to those three questions were: (1) *yes*; (2) *I can't remember*; and (3) *I can't remember*.

As the substance of what is set forth above tends to indicate, Mutchler was interviewed as part of a PSU investigation relating to a "hostile working environment" complaint that Lt. George – an LMPD officer and one of Sgt. White's supervisors – submitted to his superiors, purportedly on Sgt. White's behalf in January 2017.  During PSU's investigation of the complaint, however,

-4-

Sgt. White denied making the complaint or authorizing Lt. George to file any complaint on his behalf. Consequently, PSU focused its investigation upon whether Lt. George had filed a false report.

As the substance of the August 2, 2017 interview further indicates, PSU investigators only sought to interview Mutchler for a limited reason. Specifically, Sgt. White stated to PSU investigators that he had had a brief telephone conversation with Mutchler relating to this matter at some point after January 2017, but that he did not recall saying anything to Mutchler during their conversation about a purported hostile work environment or about any complaint to that effect. By interviewing Mutchler, PSU wished to corroborate Sgt. White's statement.

As indicated at the onset of this opinion, however, whether Lt. George did or did not file a false report is irrelevant. Rather, the present appeal is exclusively concerned with what Mutchler stated at the onset of his PSU interview:

> I do wanna note that, ah, the statement is under protest as we believe, ah, the [FOP] believes that, ah, request for representation and conversations with the collective bargaining representative, ah, are somewhat privileged.

In other words, Mutchler (and the FOP) believed that the LMPD acted improperly at the August 2, 2017 interview because it had required him to divulge privileged information, *i.e.*, information protected by a "union business" privilege. Moreover, on June 26, 2017 – in *anticipation* of that interview, and with a full

-5-

knowledge of its scope – the FOP filed a "charge of unfair labor practice" with the

Kentucky Labor Cabinet. There, the FOP set forth its position, stating in relevant

part:

> [A]n effort to interrogate the Lodge President regarding actions in his role representative of officers in disciplinary matters, constituted unlawful coercion pursuant to provisions of KRS[1] 67C.400, et seq. (the Kentucky statutes establishing collective bargaining between FOP 614 and Louisville Metro), including specifically KRS 67C.406(1)(a) and KRS 67C.402(1), which provisions are based on analog provisions of the National Labor Relations Act.
>
> . . .
>
> Louisville Metro's actions as described above constitute unlawful coercion as prohibited by and made an unfair labor practice in KRS 67C.400 et seq.

As an aside, the bulk of the FOP's arguments before this Court and

below have primarily focused upon the following two propositions: (1) Based

upon "provisions of the National Labor Relations Act," a "union business"

privilege has been recognized in jurisdictions outside of Kentucky; and (2) because

KRS 67C.406(1)(a) and KRS 67C.402(1) share similarities with those "provisions"

of the National Labor Relations Act, a "union business" privilege should now be

recognized in Kentucky.

---

[1] Kentucky Revised Statute.

Regarding *what* the "union business privilege" *is* and *why* it applied *here*, however, the FOP has never provided any substantive analysis. Instead, and from all appearances of its various pleadings below and brief before this Court, the FOP has simply adopted Mutchler's lay understanding of what it is and why it applied. As illustrated by his October 5, 2017 testimony before the Cabinet regarding the FOP's charge of "unfair labor practice" against LMPD, Mutchler described his understanding of this "privilege" in relevant part as follows:

> MUTCHLER: *I think that discussions that I have with members as the FOP president as their elected representative, I think a large majority, if not all of those are privileged.*
>
> Q: All of them? You think all of them are?
>
> MUTCHLER: I said all or a large majority.
>
> Q: No matter what the circumstances leading to that conversation are?
>
> MUTCHLER: No. Obviously I may even seek legal assistance regarding that. If a member called me up and said they just killed their wife, I don't think that's privileged. So I think it would depend on the circumstance. But if it involved administrative issues where they're speaking to me whether officially or peripherally about representation, I do believe that that should be privileged.
>
> Q: Do you think that's true whether that person is the subject of an investigation or not?
>
> MUTCHLER: I think that when they're contacting me because they may be or may soon be the subject of an

investigation and they want representation and they need to give me a general idea of what's going on so I can direct them to the appropriate representation, I think that should be privileged. I think once that occurs, and they found the representation they need, and then they're told, hey, you are officially told you're under investigation and don't discuss this, I think that my role is, for the most part over in that circumstance until of course, you know, it comes up again. For instance, if an officer is disciplined and they appeal that discipline obviously I assist in representing them at the merit board. Or if anything else occurs that they need representation for peripherally, I would be, but I don't, there's no need for me to know details, extreme details of something. I don't ask for that and I'm usually not given that. I just need to know how I need to get them the representation. I think that part should be privileged, yes.

Q: So I think your position is, with limited exceptions, *the conversations you're having with membership in your capacity as FOP president should be subject to a blanket-type of privilege*; is that right?

MUTCHLER: *I think so, yes*.

. . .

Q: Do you agree that Sergeant White/Lieutenant White was in a position to waive any conversations he may have had with you, any privilege that may have applied?

MUTCHLER: Well, first I became aware of the waiver via Lodge counsel, Mr. Leightty and no, I don't believe that regardless what personally Sergeant White or Lieutenant White may feel, I don't believe he has the authority to waive for the Lodge.

Q: Who do you think has the authority to waive any, let's just say the privilege of the Lodge while we're all

-8-

sitting here today? Who do you think has the authority to waive it?

MUTCHLER: I don't think it should be waived at all.

Q: Ever, by anyone?

MUTCHLER: I can't sit here and think of every circumstance that could potentially happen that none of us may accept, but I mean, for the most part I think it's a privilege that shouldn't be waived. Obviously I made a comment earlier, you know, I mean, *if somebody comes to me and tells me that they've committed crimes obviously there's potential it should be waived*. I would obviously contact Lodge counsel about that. On administrative matters I believe that I'm the elected representative for them, and that they should be able to have candid conversations with me and that *I should not be able to waive for them and they should not be able to waive for the Lodge*.

(Emphasis added.)

As emphasized, Mutchler understood a "union business privilege" blanketly applied to (and thus, in a disciplinary context, exempted him from testifying about) discussions he has had with union membership while functioning in his role as a union representative. Mutchler also believed this privilege could not be voluntarily waived by any individual union member, defining the only "potential" exception to this privilege as, "if somebody comes to me and tells me that they've committed crimes."

Since Mutchler testified, the FOP has somewhat refined its understanding of this "privilege." In its brief before this Court, the FOP summarizes it as follows:

> Appellant submits that because a labor organization cannot fulfill its statutory duty to represent members regarding "conditions of employment"—which include matters of discipline [FN]—and any of its agents who are employees of LMPD (as FOP president Mutchler was) would be forced to warn any represented employee seeking assistance regarding a disciplinary [sic] against disclosing the facts of the situation because, in effect, *I can be compelled by LMPD to divulge what you disclose to me* there *must* be protection against coerced disclosures of the agent's communications with employees in the course of disciplinary matters.
>
> > [FN] See, e.g., ***Nat'l Licorice Co. v. NLRB***, 309 U.S. 350 (1940), affirming an NLRB order that an employer cease bypassing negotiation with the union regarding disciplinary discharge.
>
> The term "privilege" has been applied to this protection in many of the cases, and throughout this case. However, the protection is so specific and limited that "privilege" may be an exaggerated description:
>
> - The "privilege" applies only in the collective-bargaining context, and only when the union agent in question is employed by LMPD—non-LMPD employees are of course not subject to LMPD orders. (As it happens, the current FOP 614 president, Ryan Nichols, is retired from LMPD and thus immune from any coercive power of LMPD.)

- It applies only to information the union agent has gathered in order to assist an officer in "anticipated or ongoing disciplinary proceedings."[FN]

    [FN]  See, e.g., ***Bell v. Village of Streamwood***, 806 F.Supp.2d 1052, 1056 (N.D. Ill. 2011), discussed infra.

- The "privilege" has no application to court proceedings, or administrative proceedings other than the disciplinary proceeding for which the communications were made.

The main point is that this limited privilege is necessary for the purposes of the applicable collective bargaining statutes to be effected, and therefore the Legislature must be deemed to have intended it.

With that said, perhaps the best clue to what the "union business privilege" *actually* is, and why *no* such privilege could have applied here, is found in the second footnote of the FOP's own argument, *i.e.*, its citation to *Bell v. Village of Streamwood*, 806 F. Supp. 2d 1052 (N.D. Ill. 2011).  There, the "union business privilege" was defined as follows:

> Union representatives . . . may have various duties, including representing union members in disciplinary proceedings and internal investigations.  In the course of representing a union member accused of some wrongdoing, a union representative may receive confidential information.  This role is not unlike that of an attorney.  As with the attorney-client privilege, there is a strong interest in encouraging an employee accused of wrongdoing to communicate fully and frankly with his union representative, in order to receive accurate advice about the disciplinary process. *See U.S. Dept. of Justice v. Fed. Labor Relations Auth.*, 39 F.3d 361, 368-69 (D.C.

Cir. 1994) (recognizing an employee-union representative privilege in the context of labor law). The Court therefore holds that an employee-union representative privilege will extend to communications made (1) in confidence; (2) in connection with "representative" services relating to anticipated or ongoing disciplinary proceedings; (3) between an employee and his union representative; (4) where the union representative is acting in his or her official representative capacity. *Cf. United States v. BDO Seidman, LLP*, 492 F.3d 806, 815 (7th Cir. 2007) (defining attorney-client privilege). Like the attorney-client privilege, the employee-union representative privilege is limited in that it extends only to communications, not to the underlying facts. Discussing a relevant fact with a union representative will not shield it from discovery. *See Upjohn Co. v. United States*, 449 U.S. 383, 395, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (holding the attorney-client privilege protects the disclosure of communications but does not protect the client from disclosing the underlying facts.)

The expectation of confidentiality is critical to the employee-union representative privilege. Without confidentiality, union members would be hesitant to be fully forthcoming with their representatives, detrimentally impacting a union representative's ability to advise and represent union members with questions or problems. *Absent an expectation of confidentiality, there is little need to protect the communications*.

*Id*. at 1056-57 (emphasis added).

Thus, contrary to Mutchler's understanding (which the FOP has always adopted in this matter), the "union business privilege," where it has been recognized, is *not* a "blanket-type of privilege" that applies to every conversation

-12-

that a union representative has with a union member. Rather, where it has been recognized, it has been deemed comparable to the "attorney-client" privilege.

And, in the words of another Court that discussed more of the legal underpinnings of this "privilege":

> [It] appears to originate from a decision by the Federal Labor Relations Authority ("FLRA") in *U.S. Department of the Treasury Customs Service Washington, D.C. (Respondent) & Nat'l Treasury Employees Union (Charging Party)*, 38 F.L.R.A. 1300 (Jan. 8, 1990). In that case, the privilege was recognized for the benefit of the employee: "that <u>the employee</u> be free to make full and frank disclosure to his or her representative in order that <u>the employee</u> have adequate advice and a proper defense." *Id.* at 1308 (emphasis added). In the few cases that have recognized this privilege, the privilege has been asserted for the benefit of protecting employee disclosures, not those of the union representative. *See U.S. Dep't of Justice v. Fed. Labor Relations Auth.*, 39 F.3d 361, 368-69 (D.C. Cir. 1994); *Bell v. Vill. of Streamwood*, 806 F. Supp. 2d 1052, 1058 (N.D. Ill. 2011); *Long Beach Naval Shipyard Long Beach, California (Respondent) & Fed. Emps. Metal Trades Coun-cil AFL-CIO (Charging Party/union)*, 44 F.L.R.A. 1021, 1038 (Apr. 29, 1992). The union representative-bargaining unit member privilege is analogous to the attorney-client privilege, whose purpose is also to [sic] "to encourage full and frank communication between attorneys and their clients." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). And just as the attorney-client privilege "is that of the client, not that of the attorney," *Am. Standard Inc. v. Pfizer Inc.*, 828 F.2d 734, 745 (Fed. Cir. 1987), *if there is a union representative-bargaining unit member privilege, it belongs to the employee and not the union representative*.

*Martin v. Department of Homeland Security*, 810 F. App'x 867, 871 (Fed. Cir.

2020) (some emphasis added).

In short, it is unsurprising that the FOP's understanding of *whom* the

"union business privilege" belongs to derives from the testimony of Mutchler – a

lay witness – rather than any form of legal authority. The "union business

privilege," in the limited cases where it has been recognized, does not belong to the

union or its representative. Just as the attorney-client privilege belongs to the

*client*, the union business privilege belongs to the *employee*. *Id*.

Recall, when Mutchler testified during the administrative proceedings

before the Cabinet, he was asked about and acknowledged that there had been a

"waiver" from Sgt. White of "any privilege" that might have applied to any

conversation they may have had relative to this matter. Specifically, on June 23,

2017, Sgt. White executed a written waiver stating:

> This letter is to notify the Professional Standards Unit
> that I Sergeant Armin White waive any client privilege
> that may or may not exist regarding my conversations
> with the FOP Lodge 614 regarding Professional
> Standards Unit case 17-034.
>
> I consent to the Professional Standards Unit investigators
> speaking to FOP Lodge 614 regarding my conversations
> with FOP President Sgt. David Mutchler.

To be clear, Mutchler and the FOP have never disputed that Sgt.

White's waiver, set forth above, was knowing, voluntary, and intentional. *See*

-14-

*Mullins v. Picklesimer*, 317 S.W.3d 569, 578 (Ky. 2010) (discussing elements of waiver). Indeed, Sgt. White testified during the administrative proceedings before the Cabinet that it *was* knowing, voluntary, and intentional; and, the FOP did not question his testimony at all. Instead, the FOP's argument has always been one of *authority*, *i.e.*, that the "union business privilege" belonged to the *FOP*, not Sgt. White.

In its own review of this matter, the Cabinet determined in its dispositive order that LMPD did not commit an unfair labor practice by requiring Mutchler to submit to the PSU interview because: (1) "there is no indication that Sgt. Mutchler was asked to divulge any information that may have been considered confidential"; and, in any event, because (2) there is no established union business privilege in Kentucky. The Jefferson Circuit Court made the same determinations.

Now on appeal, as noted, the FOP once again directs most of its arguments toward the proposition that we should recognize a union business privilege in Kentucky. While that is an interesting question, we cannot answer it on the case before us because even if such a privilege could be recognized (which we have strong reservations about), it belonged to Sgt. White. And, *he* did not

deem his conversation with Mutchler confidential and waived any privilege in writing.[2]

It is enough to say, however, that while opinions differ on this subject across many jurisdictions,[3] the Kentucky Supreme Court has promulgated no rule recognizing such a privilege; nothing in KRS Chapter 67C explicitly recognizes any such privilege; and, simply *inferring* a privilege from a statute is, as our caselaw amply demonstrates, a strongly disfavored practice. *See* Kentucky Rule of Evidence (KRE) 501 (providing that privileges can be granted by the Constitution, rules promulgated by the Kentucky Supreme Court, or by statute); *see also Collins v. Braden*, 384 S.W.3d 154, 159 (Ky. 2012) (explaining "the almost universally accepted rule that testimonial privileges are generally disfavored and should be strictly construed." (citation omitted)). If the FOP wishes to pursue the recognition and protection of the privilege, that is more appropriately the prerogative of the legislative branch or the Kentucky Supreme Court. Hence, given this and in light of Sgt. White's wavier, any further discussion of case law from other jurisdictions as cited by the FOP is a futile endeavor.

---

[2] The FOP also asks this Court to consider whether the privilege might have applied, had LMPD questioned Mutchler about any conversations Mutchler may have had with Lt. George – someone who did not execute a waiver of any kind of privilege. We decline to do so because it is not our prerogative to render advisory opinions. *See Bingham Greenebaum Doll, LLP v. Lawrence*, 567 S.W.3d 127, 129-30 (Ky. 2018).

[3] *See, e.g.*, Michael D. Moberly, *Extending a Qualified Evidentiary Privilege to Confidential Communications Between Employees and Their Union Representatives*, 5 NEV. L.J. 508 (2004).

In sum, a reviewing court may only overturn the decision of an agency if the agency acted arbitrarily or outside the scope of its authority, if the agency applied an incorrect rule of law, or if the decision itself is not supported by substantial evidence on the record. *Ky. State Racing Comm'n v. Fuller*, 481 S.W.2d 298, 300-07 (Ky. 1972). Here, the FOP's sole contention is that the Cabinet misapplied the law discussed above. We disagree. For the reasons discussed above, we therefore AFFIRM.

MAZE, JUDGE, CONCURS AND FILES SEPARATE OPINION.

CALDWELL, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

MAZE, JUDGE, CONCURRING: I fully agree with the reasoning and the result of the majority opinion. I write separately to emphasize the reasons why this is not the case to recognize a union business privilege. First and foremost, as the majority opinion aptly states, Sgt. White made a knowing and voluntary waiver of any privilege. I agree with the majority that the FOP has no standing to assert a privilege.

Furthermore, our legislature has the exclusive authority to adopt privileges on matters outside of courtroom proceedings. *Commonwealth, Cabinet for Health and Family Servs. v. Chauvin*, 316 S.W.3d 279, 286 (Ky. 2010). When courts are called upon to address the issue, the issue is generally whether the

General Assembly expressed a clear intent to establish a privilege, either through the express language of the statute or by necessary implication. In *Chauvin*, the General Assembly enacted legislation limiting the disclosure of KASPER[4] information. *Id.* Similarly, in *Manns v. Commonwealth*, 80 S.W.3d 439 (Ky. 2002), the Court discussed a statutory provision restricting disclosure of juvenile records. And in *Sisters of Charity Health Systems., Inc. v. Raikes*, 984 S.W.2d 464 (Ky. 1998), the legislation limited the disclosure of peer-review hospital records in medical malpractice suits. In each of these cases, the Court inferred the General Assembly's intent to create a privilege from statutory language excluding certain specifically identified records from disclosure.

Here, the FOP does not cite to any specific statutory language creating an exception from disclosure of identified information. Rather, the FOP argues that this Court should infer the existence of a privilege as a necessary implication of the collective bargaining scheme in KRS Chapter 67C. The FOP points out that other jurisdictions have inferred the existence of a union business privilege from similar statutory language. The National Labor Relations Board (NLRB) recognized the existence of an implied union business privilege under the National Labor Relations Act in Cook Paint and Varnish Co., 258 N.L.R.B. No. 166, 258 N.L.R.B. 1230, 1981 WL 21122 (1981). However, the NLRB has been delegated

---

[4] Kentucky All-Schedule Prescription Electronic Records.

-18-

broad authority to enforce the Act's provisions prohibiting employers from engaging in any unfair labor practice affecting commerce.  *May Dep't Stores Co. v. N.L.R.B.*, 326 U.S. 376, 390, 66 S. Ct. 203, 211-12, 90 L. Ed. 145 (1945).   The FOP does not identify any similar delegation of authority to the Labor Cabinet.

Nevertheless, the FOP points out that courts in other states have adopted similar interpretations of their collective bargaining statutes.  But to date, only two states, New York and Alaska, have applied the *Cook Paint* reasoning to their statutes.  *See City of Newburgh v. Newman*, 421 N.Y.S.2d 673, 70 A.D.2d 362 (N.Y. App. Div. 1979), and *Peterson v. State*, 280 P.3d 559 (Alaska 2012).  Illinois has expressly adopted a statutory union agent – union member privilege.  *Bell v. Vill. of Streamwood*, 806 F. Supp. 2d 1052 (N.D. Ill. 2011) (citing 735 ILL. COMP. STAT. ANN. 5/8-803.5).  And three other states, California, New Hampshire, and Massachusetts, have declined to apply the *Cook Paint* reasoning to their collective bargaining statutes.  *American Airlines, Inc. v. Superior Court*, 114 Cal. App. 4th 881, 891, 8 Cal. Rptr. 3d 146 (2003); *In re Grand Jury Subpoena*, 155 N.H. 557, 560–561, 563, 926 A.2d 280, 283 (2007); and *Chadwick v. Duxbury Pub. Schs.*, 475 Mass. 645, 655, 59 N.E.3d 1143, 1151 (2016).

Thus, the weight of precedent does not overwhelmingly favor the interpretation of KRS Chapter 67C advocated by the FOP.  In any event, Kentucky law does not favor broad assertions of privilege because they contravene the

fundamental principle that the public has a right to every man's evidence. *Raikes*, 984 S.W.2d at 468. For this reason, our courts generally refrain from recognizing privileges merely by implication of statute. *See Caldwell v. Chauvin*, 464 S.W.3d 139, 159-60 (Ky. 2015) (holding that the federal Health Insurance Portability and Accountability Act (HIPAA) does not create a privilege prohibiting interviews of nonexpert treating physicians). I am convinced that this Court is not authorized to adopt such a broad reading of the statute. Rather, that prerogative is left to either the Kentucky General Assembly or our Supreme Court, not to an intermediate appellate court. As a result, even if the proposed privilege had not been clearly waived, I would decline to recognize the existence of a union business privilege in this case.

CALDWELL, JUDGE, DISSENTING: I respectfully dissent. In the narrow context of determining whether unfair labor practices occurred in the course of internal disciplinary proceedings and investigations, Kentucky Revised Statutes (KRS) 67C.400 *et seq*. implicitly creates a limited "privilege" such that the FOP representative cannot be compelled to disclose the content of communications with union members about internal disciplinary proceedings to the employer. Further, while I believe the majority opinion is correct that this limited "privilege" would belong to the employee and not the union, the Kentucky Labor Cabinet did not make a finding that the employee had validly waived this privilege.

Therefore, I would reverse the Jefferson Circuit Court's judgment and remand with directions to vacate the Cabinet's denial of the unfair labor practice charge and remand to the Cabinet to determine if the "privilege" was validly waived.

Of note, while both parties and the courts have used the term "privilege," and it is not inaccurate, it also imbues a meaning of consequence far more reaching than what I perceive is sought. I would express no opinion as to whether a union business privilege exists other than as implicitly arising under KRS 67C.400 *et seq.* in the specific context discussed herein. In other words, I would not reach whether Kentucky law generally recognizes a union business privilege nor whether a union business privilege arises under any other statute, regulation, or other legal authority. I would simply recognize that the communications between an employee and his union representative regarding internal disciplinary proceedings in the specific context here are confidential. And I would recognize that it is an unfair labor practice in this context for an employer to compel disclosure of those communications under threat of further disciplinary actions or other coercive measures. For ease of reference, I will refer to a "union business privilege" to signify the protection from disclosure of confidential communications between union representatives and members regarding internal disciplinary proceedings—again, in the specific context here (*i.e.*, application of KRS 67C.400 *et seq.*).

I must disagree with the circuit court's opinion, and the concurring majority opinion, accepting the Cabinet's argument that it lacked authority to recognize a union business privilege because "KRS 67C.402 and KRS 67C.406 contain no language which would lead to the creation of a union business privilege between a union representative and its members." And while I do not fundamentally disagree with the circuit court's view of the legislature as having power to create privileges, I construe the legislature's adoption of KRS 67C.400, *et seq.* to necessitate by implication the creation of this limited union business privilege, particularly in light of authority in existence at the time of its adoption—such as Cook Paint and Varnish Co., 258 N.L.R.B. No. 166, 258 N.L.R.B. 1230 (1981). Despite any lack of specific language explicitly recognizing a privilege or the confidentiality of certain communications, I believe such a privilege is implied reading all words and phrases in the governing statutes in their proper context. In short, I disagree with the Cabinet's conclusion that the existence of this privilege is precluded by a lack of explicit language specifically referring to a "privilege" or information deemed "confidential."

KRS 67C.402(1) states:

> Police officers of a consolidated local government shall have, and shall be protected in the exercise of, the right of self-organization, to form, join, or assist any labor organization, to bargain collectively through representatives of their own choosing on questions of

> wages, hours, and other conditions of employment free
> from interference, restraint, or coercion.

Our legislature has long called for liberal construction of statutes, "with a view to promote their objects and carry out the intent of the legislature . . . ." KRS 446.080(1) (enacted in 1942). Further, in construing statutes, we must consider all words or phrases in a statute and not ignore some words or phrases. *Pearce v. University of Louisville, by and through its Board of Trustees*, 448 S.W.3d 746, 751 (Ky. 2014); *Krieger v. Garvin*, 584 S.W.3d 727, 729 (Ky. 2019).

So, when construing KRS 67C.402(1)'s language "to bargain collectively through representatives of their own choosing on questions of wages, hours, and **other conditions of employment** free from interference, restraint, or coercion" there is simply no logical way to not include internal disciplinary proceedings as an "other condition[] of employment." (Emphasis added.) In fact, when considering "other conditions of employment" outside of those relating to wages and hours, it is difficult to think of one more significant than conduct codes and rules regarding internal disciplinary measures.

As FOP points out, many provisions KRS 67C.400 *et seq.* are nearly identical to provisions of the National Labor Relations Act (NLRA).[5] Thus, I find

---

[5] *See* KRS 67C.402(1) & (3), providing:

> (1) Police officers of a consolidated local government shall have, and shall be
> protected in the exercise of, the right of self-organization, to form, join, or assist

-23-

persuasive outside authority construing the NLRA or other similar statutory provisions to recognize a limited union business privilege in the context here. *See Cook Paint and Varnish Co.*, *supra*; *City of Newburgh v. Newman*, 421 N.Y.S.2d 673, 70 A.D.2d 362 (N.Y. App. Div. 1979).

While Kentucky courts may not be required to follow *Cook Paint* or federal or other state court cases construing the NLRA or similar statutes to determine if a union business privilege exists, we may certainly consider whether we find such outside authority persuasive, particularly when there is no Kentucky

---

any labor organization, to bargain collectively through representatives of their own choosing on questions of wages, hours, and other conditions of employment free from interference, restraint, or coercion.

. . .

(3) Labor organizations recognized by a consolidated local government as the exclusive representative or so designated in accordance with the provisions of this section shall be responsible for representing the interest of all police officers in the unit without discrimination.

*Compare* 29 U.S.C. (United States Code) § 157, providing in part: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . ." *with* KRS 67C.406(1)(a), providing: "Except as provided in KRS 336.130(3), consolidated local governments, their representatives, or their agents are prohibited from: Interfering, restraining, or coercing police officers in the exercise of the rights guaranteed in KRS 67C.402[.]"

*Compare* 29 U.S.C. § 158(a)(1), providing: "It shall be an unfair labor practice for an employer-- to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title" *with* KRS 67C.410(1), providing: "Violations of the provisions of KRS 67C.406 shall be deemed to be unfair labor practices remedial by the cabinet . . ."

*Cf.* 29 U.S.C. § 160(a), providing: "The Board is empowered, as hereinafter provided, to prevent any person from engaging in any unfair labor practice (listed in section 158 of this title) affecting commerce."

case directly on point. Kentucky's appellate Courts have often cited federal case law construing federal statutes that are similar to Kentucky statues to interpret said statutes. This has occurred even when our state statutes make no explicit reference to those similar federal statutes. *See, e.g.*, *Commonwealth, Dep't of Agriculture v. Vinson*, 30 S.W.3d 162, 169 (Ky. 2000); *Kentucky New Era, Inc. v. City of Hopkinsville*, 415 S.W.3d 76, 80 n.3 (Ky. 2013).

Further, I agree with FOP that it makes sense to infer that communications between union representatives and union members are confidential and prohibited from coerced disclosure, in certain contexts, in order to allow union representatives to effectively perform their statutory duties under KRS 67C.400 *et seq*. I do not believe Sgt. Mutchler was far off point with his lay understanding of what a union business privilege would entail. And, while courts interpret statutes, statutes are written by the legislature for all people, not just lawyers. It is not unheard of for a common understanding to be the intent of legislation.

It is perhaps best said in *Cook Paint*:

> [T]he very facts sought were the substance of conversations between an employee and his steward, as well as the notes kept by the steward, in the course of fulfilling his representational functions. Such consultation between an employee potentially subject to discipline and his union steward constitutes protected activity in one of its purest forms. To allow Respondent here to compel the disclosure of this type of information

-25-

under threat of discipline manifestly restrains employees in their willingness to candidly discuss matters with their chosen, statutory representatives.

258 N.L.R.B. at 1232. The Federal Labor Relations Authority[6] relied heavily on the analysis in *Cook Paint* to explicitly recognize a "privilege" just like the limited union business privilege I urge recognizing here in *U.S. Department of the Treasury Customs Service Washington, D.C. and National Treasury Employees Union*, 38 F.L.R.A. 1300, 1308-09 (Jan. 8, 1990).

Though Louisville/Jefferson County Metro Government (LMG) points out that various federal and state courts have determined that no union business privilege existed even where federal or state statutes may resemble the NLRA, many of these decisions concerned a significantly different context than here. Rather than concerning court review of an administrative agency action about whether questioning of a union representative amounted to an unfair labor practice, often these decisions involved discovery disputes in civil litigation. *See Degrandis v. Children's Hospital Boston*, 203 F. Supp. 3d 193 (D. Mass. 2016); *Chadwick v. Duxbury Pub. Schs.*, 475 Mass. 645, 59 N.E.3d 1143 (2016). In contrast, in the context of determining whether an unfair labor practice resulted from compelling disclosure of communications between union representatives and

---

[6] The Federal Labor Relations Authority is the independent federal administrative agency that administers the labor-management relations program for non-postal federal employees.

members about internal disciplinary proceedings, other authorities have recognized the limited privilege I urge recognizing here. *See Cook Paint; City of Newburgh; U.S. Department of Treasury, supra.*

As for waiver of any such privilege, LMG correctly argues that privileges may be waived. But though LMG points to Sgt. White's signing a document indicating he intended to waive any privilege applicable to him, the Cabinet did not make a definitive finding that Sgt. White waived the privilege. And FOP has asserted Sgt. White did not even have an opportunity to consult counsel before signing the document.

As FOP argues, the purpose of the privilege is to encourage individual union members to make candid disclosures to their union representatives, regarding the individual union member as the holder; therefore, it makes sense to prohibit disclosure of communications with the representative unless the individual member waives the privilege. And FOP has not cited any authority to support its argument that the union or union representative is the holder of the privilege.

Although there is not a plethora of published authority on the question, an unpublished federal appellate court decision held that a union business-type privilege would be held by the represented employee and not by the union representative. *See Martin v. Department of Homeland Security*, 810 F.

App'x 867 (Fed. Cir. 2020). On the issue of waiver, I agree with the majority that it is the employee, and not the union, that holds the union business privilege.

However, neither the circuit court's opinion, nor the majority's, definitively states whether a union business privilege existed. Instead, they incorrectly distinguished this case from *Cook Paint* based on Sgt. White's not being subject to investigation and having waived the privilege—contrary to the Cabinet's findings—to find that any privilege did not apply or was waived.

The circuit court states on page five of its opinion and order that Sgt. White "was not the subject of the PSU investigation." But the Cabinet's factual findings included a statement that the PSU investigator had testified that "Sgt. White had been served a notice by the time of the interview and was therefore considered by the PSU to be under investigation." And the Cabinet further explained in a footnote that: "Officers generally receive a '48-Hour Notice' before they are questioned if they face the possibility of disciplinary action in relation to the subject matter of the questioning." Sgt. White received such a 48-Hour Notice.

In short, Sgt. White was the holder of the privilege recognized herein pertaining to his communications with his union representative (Sgt. Mutchler) about internal disciplinary matters. But the Cabinet made no finding whether he validly waived any privilege. As the circuit court functioned as an appellate court in reviewing the Cabinet's decision under KRS 13B.140(1), it should have

-28-

reviewed only the findings actually made by the Cabinet rather than making its own findings on matters not decided by the Cabinet. And this Court similarly should not make the initial determination about whether the privilege was waived. *See Klein v. Flanery*, 439 S.W.3d 107, 122 (Ky. 2014) ("As an appellate court, we review judgments; we do not make them."); *Calhoun v. CSX Transp., Inc.*, 331 S.W.3d 236, 245 (Ky. 2011) ("In this Commonwealth, it is axiomatic that appellate courts are not fact-finders . . . the Court of Appeals exceeded its scope of review when it made factual findings regarding the validity of some of Appellants' evidence.").

Even though Sgt. White initialed a form purporting to waive any privilege applying to him, signing a waiver form does not always mean that a waiver is valid. *See Humphrey v. Commonwealth*, 153 S.W.3d 854, 858 (Ky. App. 2004) (despite juvenile's signing form indicating he was waiving his right to a preliminary hearing before transfer to circuit court, "based on the record, we are not convinced that the waiver was valid."). FOP suggested to the decision-makers below that Sgt. White did not validly waive a privilege as it emphasized he did not consult with union representatives or counsel before signing the waiver form. But the Cabinet did not determine whether the waiver was valid—a matter which can involve questions of fact as well as law. *See generally* 5 C.J.S. *Appeal and Error* § 824 (2021) (waiver of attorney-client privilege generally mixed question of law

and fact). Rather than attempt to make our own findings of fact or conclusions of law regarding the validity of Sgt. White's waiver, I believe it is more appropriate to remand to the Cabinet to address this matter.

So, I would recognize a limited union business privilege in this specific context, and I would reverse the trial court with directions to vacate the denial of the unfair labor practice charge and to remand to the Cabinet for the limited purpose of determining whether Sgt. White validly waived this union business privilege.

BRIEFS AND ORAL ARGUMENT
FOR APPELLANT:

David Leightty
Louisville, Kentucky

BRIEF FOR APPELLEE,
LOUISVILLE/JEFFERSON
COUNTY METRO GOVERNMENT:

Michael J. O'Connell
Jefferson County Attorney

J. Daniel Landrum
Wendy C. Hyland
Assistant Jefferson County Attorneys
Louisville, Kentucky

ORAL ARGUMENT FOR
APPELLEE,
LOUISVILLE/JEFFERSON
COUNTY METRO GOVERNMENT:

Wendy C. Hyland
Assistant Jefferson County Attorney
Louisville, Kentucky

BRIEF AND ORAL ARGUMENT
FOR APPELLEE, KENTUCKY
LABOR CABINET:

John R. Rogers
Frankfort, Kentucky